**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**Case No. 3:17-cv-00328-JWD-EWD**

**Jury Trial Demanded**

TRAVIS DAY

Plaintiff,

versus

CITY OF BATON ROUGE, through Mayor Sharon Weston Broome; PARISH OF EAST BATON ROUGE, through President Sharon Weston Broome; SID J. GAUTREAUX III, in his Official Capacity as Sheriff of East Baton Rouge Parish; AIX GROUP, d.b.a. NOVA CASUALTY CO.,

Defendants.

# SECOND AMENDED COMPLAINT

## I. NATURE OF THE ACTION

1.     On July 5, 2016, officers of the Baton Rouge Police Department tased, tackled, and shot Alton Sterling, a Black father of five and resident of Baton Rouge, Louisiana. Over the following week, members of the Baton Rouge community – many of them Black residents – came together to voice anger and disappointment at the killing of Mr. Sterling and the aggressive and racist policing they had endured for decades. People gathered on the streets, sidewalks, and neutral grounds[1] of Baton Rouge to protest. The protests were spontaneous and peaceful. The protesters were law-abiding.

2.     Despite protesters' peaceful aims, Defendants participated in the development and implementation of a coordinated strategy, motivated by racial animus, to deny members of the

---

[1] Outside of Southeast Louisiana, "the neutral ground" is commonly called a median.

Black community of Baton Rouge their right to grieve, express their anger, and demand equal protection from law enforcement. The Defendants, in their planned response to the peaceful protests, validated, encouraged and ratified the continued use of decades-long practices of intimidation, excessive force, illegal arrests, illegal detention, denigration, and criminalization.

3.    In furtherance of this conspiracy, Defendants and their agents arrested protesters without just cause, solely to suppress the protests and deny the protesters' right to assemble, to free expression, and to petition the government for redress of grievances. Defendants' actions were particularly aimed to suppress dissent of Black citizens of Baton Rouge.

4.    To this end, as the protests began, Defendants and their agents, in line with their decades-long practice of suppressing critics through unconstitutional means, participated in the creation and implementation of a plan to intimidate the protesters through the use of violent, militarized police tactics, which included the use of rifles, batons, riot shields, armored vehicles, and armed officers.

5.    The coordinated strategy was implemented on July 7 and 8, 2016, during which time Defendants and their agents set out to arrest, and facilitated the arrests, of protesters without probable cause, using the pretext that the protesters had violated a state law proscribing obstruction of highways and public roads. Defendants sought to disrupt the peaceful protests by utilizing pre-determined tactics to disrupt crowds of peaceful, law-abiding protesters.

6.    On July 9, 2016, Defendants and their agents continued the implementation of their coordinated strategy to silence peaceful protest. In doing so, Plaintiff Travis Day was arrested on the false grounds that he had obstructed a highway in Baton Rouge. Plaintiff had no intention of obstructing the highway, and never did so. Rather, his purpose was to protest in a peaceful manner.

7.     Plaintiff was detained in the East Baton Rouge Parish Prison, subjected to harsh detention conditions, and labeled as a criminal without just cause.

8.     As a direct result of Defendants' actions and Plaintiff's arrest, Travis Day was terminated from his employment.

9.     Shortly after his release, the East Baton Rouge District Attorney publicly announced that he would not file bills of information against any of the protesters charged only with obstructing a highway, evidence that these charges were unwarranted.

10.     This action seeks to hold Defendants liable for the unjust and racially discriminatory arrests they conducted, through the Baton Rouge Police Department ("BRPD"), the East Baton Rouge Sheriff's Office ("EBRSO"), and the broader law enforcement response to the legal actions of residents, solely to quash peaceful protests against the pattern of racist law enforcement by the City of Baton Rouge/Parish of East Baton Rouge.

## II.  JURISDICTION AND VENUE

11.     Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1985(3), to vindicate his rights guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution. Plaintiff also brings supplemental state-law claims. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

12.     This case seeks remedies under 28 U.S.C. §§ 1920, 2201, 2202 and 42 U.S.C. §§ 1983, 1985(3), and 1988.

13.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## III.  PARTIES

### A.  Plaintiff

14. Plaintiff TRAVIS DAY is a Black adult resident and citizen of Baton Rouge, Louisiana who was arrested on July 9, 2016, near the intersection of Goodwood Boulevard and Airline Highway for "simple obstruction of a highway of commerce" while lawfully protesting the shooting death of Mr. Alton Sterling and racist policing in Baton Rouge.

**B. Defendants**

15. Defendant CITY OF BATON ROUGE is a political subdivision of the State of Louisiana, the city's governing authority is consolidated with the government of Defendant EAST BATON ROUGE PARISH. For this reason, the consolidated government is referred to as "CITY/PARISH" throughout this complaint. At all relevant times, through then-Mayor-President Kip Holden and then-BRPD Police Chief Carl Dabadie, CITY/PARISH was responsible for the supervision, administration, policies, practices, procedures, and customs for the City/Parish and the City/Parish's police department.

16. Defendant SHARON WESTON BROOME is an adult resident of the Middle District of Louisiana. She is the Mayor-President of the CITY/PARISH. She is responsible for the supervision, administration, policies, practices, procedures, and customs for the CITY/PARISH and the City's police department. She is responsible for the hiring, training, discipline, supervision, and control of BRPD officers. She is sued in her official capacity as the current Mayor-President of the CITY/PARISH.

17. Defendant SID J. GAUTREAUX III is the Sheriff of East Baton Rouge Parish and is an adult resident of the Middle District of Louisiana. The office of Sheriff is an autonomous political subdivision of the State of Louisiana. Defendant GAUTREAUX was responsible for the supervision, administration, policies, practices, procedures, and customs of the East Baton Rouge Sheriff's Office ("EBRSO"). Defendant GAUTREAUX was and is a final

policymaker for the East Baton Rouge Sheriff's Office. He was and is responsible for the hiring, training, discipline, supervision, and control of the EBRSO command staff, supervisors, and deputies. He is sued in his official capacity.

18.      Defendant AIX GROUP, doing business as NOVA CASUALTY COMPANY ("NOVA") is an insurance company that, on information and belief, provides insurance to the East Baton Rouge Sheriff's Office. NOVA is domiciled in Connecticut. Its principal business establishment in Louisiana is in Baton Rouge.

## IV.  FACTUAL ALLEGATIONS[2]

### A. The Custom and Practice of Racist Policing in Baton Rouge

19.      Long before Alton Sterling's murder and the ensuing protests in July 2016, relations between Baton Rouge's law enforcement agencies and the Baton Rouge community had badly deteriorated. Law enforcement relations with the Black community of Baton Rouge have been marked by episodes of tension and violence for generations.

### 1.  BRPD's History of Police Misconduct.

20.      As members of the Baton Rouge community, the United States Department of Justice, and others have noted for decades, the City/Parish has long failed to hire a proportionate number of Black officers to the BRPD. The failure of the City/Parish to hire a proportionate number of Black officers, and Black Baton Rouge residents in particular, has created a police force that is separated from the community it seeks to protect. Since 1980, the City of Baton Rouge has been under a consent decree with the Department of Justice intended to remedy racially discriminatory hiring practices of a class of Louisiana police and fire departments, including the BRPD. While nearly thirty municipal defendants in that case have reached

---

[2] Plaintiff makes the allegations in this Complaint based on personal knowledge as to matters in which he has personal involvement and on information and belief as to all other matters.

compliance with the consent decree and been dismissed from the case, only the City of Baton Rouge and one other municipality have not reached compliance—nearly four decades after the consent decree took effect.

21.     According to the 2010 U.S. Census, the City of Baton Rouge is 54.5% Black and 39.4% White. However, the BRPD is 30% Black and 67% White. Moreover, nearly half of all BRPD officers live outside of East Baton Rouge Parish, and only one-fifth (1/5) live within the City of Baton Rouge.

22.     Discriminatory practices by the BRPD have long extended beyond the Department's employment practices into BRPD's interactions with the community. In September of 2005, the population of Baton Rouge swelled as many residents of New Orleans, a majority Black city, sought refuge from Hurricane Katrina and the resultant flood. The Michigan State Police and New Mexico State Police both sent troopers to assist the BRPD in policing the city's rapidly growing population.

23.     Within three days of the troopers' arrival, both state police agencies had ordered their troopers to cease operations with BRPD after the troopers witnessed and complained of egregious misconduct and potentially criminal actions by BRPD officers. A spokeswoman for the Michigan State Police told a reporter that "troopers observed Baton Rouge police officers engage in actions that were an affront to their sense of dignity and respect."

24.     Members of both the Michigan State Police and the New Mexico State Police shared observations and concerns that were compiled in a formal letter of complaint to the BRPD. One trooper reported that "I personally believe that most of the Baton Rouge Police Department are good officers that are being directed by their supervisors to crack down on the public."

25.     Examples of Baton Rouge police officers' antagonism toward Black people as alleged by the out-of-state troopers included multiple instances of excessive force against Black people, including minors, through the use of tasing, hitting, choking, and pepper spraying of residents, without warning or threat to the safety of officers or civilians; searches of Black individuals and their vehicles without reasonable suspicion or probable cause; and possibly falsifying information against Black individuals in police reports.

26.     In an attempt to support officers of the BRPD in the face of the allegations of racial animus and racially discriminatory policing in September 2005, the former City/Parish Mayor Kip Holden publicly stated, "If there's a blame to be placed on aggressive enforcement, blame it on me." This statement by former City/Parish Mayor Holden ratified and condoned the unconstitutional actions and inactions of the BRPD officers.

27.     BRPD, under the direction of Mayor Holden, former Chief Carl Dabadie, and other Chiefs of Police, also resisted efforts of media and public interest advocates to gain information regarding these post-Katrina abuses, as part of an ongoing effort to cover up and conceal race-based officer misconduct, and to promote the police code of silence.

28.     As part of the effort to cover up and conceal allegations of race-based officer misconduct and to promote the police code of silence, the CITY/PARISH and the BRPD actively resisted public records requests and a Public Records Law enforcement action filed by The Advocate newspaper seeking access to the Internal Affairs Division investigative report in 2006. Former BRPD Police Chief Jeff LeDuff authorized a meritless suit to delay and thereby shield investigation records from public view, while imposing high costs on the newspaper.

29.     In addition to repeated allegations of excessive force and unconstitutional arrests, both before and after the out-of-state troopers' complaints, it has been reported that BRPD

officers disproportionately arrest Black residents of Baton Rouge on drug charges. A 2017 report by Together Baton Rouge, a coalition comprised of churches and community-based organizations, studied publicly available arrest data for the years 2011–16. The report concluded that while rates of drug *use* are similar in every ZIP code in Baton Rouge, residents of the poorest ZIP codes, whose populations tend to be overwhelmingly Black, are arrested at grossly disproportionate rates.

30.    In particular, the Together Baton Rouge study classified four ZIP codes, all in North Baton Rouge, the majority-Black section of the city, as "high enforcement areas" and noted that they were "90% black, twice as poor, use drugs slightly *less* frequently and have *five times as many arrests for drug possession*" as low-enforcement, majority-White ZIP codes. (Emphasis in original.)

31.    In 2011, then-BRPD Chief Dewayne White publicly stated that ten percent of the department's officers failed to exercise basic levels of professionalism, and that "it's become so ingrained" in the minds of some officers that they "believe that everybody they come across or most people they come across with that color of skin is probably a criminal." Chief White described the impact that racially discriminatory policing has on the community: "When the question is raised with an African-American congregation or a constituency, whether they trust the Police Department, no one raises their hand. That, in itself, is indicative of a problem, and we have got to win the trust of that community."

32.    Former Mayor Holden fired Chief White in 2013. White and his attorney have alleged that Holden micromanaged BRPD during Chief White's tenure. White and his attorney have further alleged that a month prior to his firing, Holden verbally ordered White to discuss all personnel and disciplinary matters with the Mayor's Office prior to taking any action. This order

constituted a temporary change in policy specific to the brief remainder of Chief White's tenure, as, on information and belief, the Chief of the BRPD retains authority over hiring and firing decisions without the need for approval by the Mayor, except for this specific instance in which Holden attempted to circumvent Chief White's authority.

33.     Former BRPD Chief Carl Dabadie was hired in the wake of Chief White's dismissal. Holden, Dabadie and the CITY/PARISH maintained the pattern and practice of ratifying, permitting, and encouraging racist policing in BRPD by, *inter alia*, (a) denying the prevalence of racist attitudes among White BRPD officers; (b) refusing to investigate the prevalence of such attitudes; and (c) forcing citizens to seek court orders under the Public Records Law—through costly and protracted litigation—before disclosing of the results of investigations into racism in BRPD.

34.     The racial animus decried by former Chief White was later laid bare by the publication in September 2014 of a series of racist text messages sent by a BRPD officer to a civilian.  In the messages, the officer, a fifteen-year veteran of the Department, referred both to Black colleagues and civilians with racial epithets, and stated, *inter alia*, "I wish someone would pull a Ferguson on them and take them out. I hate looking at those African monkeys at work . . . I enjoy arresting those thugs with their saggy pants."

35.     The officer was placed on administrative leave by BRPD and resigned before any disciplinary action was taken against him by the Department. On information and belief, no action was taken by the CITY/PARISH, through its policymakers Dabadie and Holden, or others, to determine the extent of similar racist attitudes among other BRPD officers. Dabadie stated publicly that there was no need to do so, because the issue was confined to the lone officer.

36. The CITY/PARISH's response to the racist text messages through its policymakers Dabadie and Holden betrayed a strategy to cover up the prevalence of racist attitudes among White BRPD officers. Alternatively, the response of the CITY/PARISH, through its policymakers Dabadie and Holden amounted to conscious disregard of the prevalence of racist attitudes among White BRPD officers.

37. In addition to racially discriminatory policing, the BRPD, under the direction of the CITY/PARISH through its policymakers, including Holden and Dabadie, implemented a policy, practice or custom of using excessive force against arrestees.

38. In addition to widespread protest and advocacy stemming from the shooting death of Alton Sterling, multiple lawsuits in recent years have sought to hold BRPD and CITY/PARISH accountable for its policy, practice or custom of excessive uses of force, including: (a) the 2007 arrest of Brian Townsend on a complaint of "loud music" with pepper spray and force that caused the rupture of Townsend's bladder; (b) the violent 2008 arrest of Jon Leigh Shoulders for smoking marijuana, which resulted in Shoulders' skull being fractured and caused internal bleeding and permanent brain damage; (c) the 2011 killing of Carlos Harris, who was shot to death by an officer after Harris crashed a car that he'd been ordered by the officer to remove from the scene of a crime—despite Harris's informing the officer that he was intoxicated; (d) a 2014 incident in which BRPD officers strip-searched Brett Percle, a visitor to a home that was being searched by the officers, then kicked Percle with such force that his head slammed into the floor, knocking several teeth out of his mouth; (e) a 2015 incident in which a reporter and a producer for local media outlet WBRZ were handcuffed, and one arrested, for taking pictures of an arrest; and (f) a 2016 incident in which Ja'Colby Davis, then sixteen years old, was held down by multiple officers while one officer repeatedly punched him in the head.

39.     In recent years, suits against the City/Parish for BRPD's excessive uses of force and unconstitutional arrests have resulted in sizeable yearly settlements by the Parish Attorney. For example, the City/Parish paid $372,434 to settle such cases in 2015, $581,286 in 2014, and $437,112 in 2011.

40.     BRPD has not addressed the problems of racial profiling and overt racial animus by members of the BRPD, despite ample evidence of such racial profiling and animus. Instead, the CITY/PARISH and its agents have chosen to consciously disregard and cover up the prevalence of racist attitudes among BRPD officers.

41.     As described in the preceding paragraphs, the CITY/PARISH and BRPD engaged in a continuing pattern, custom, and practice of the use of excessive force and illegal arrests targeting Black residents. Similarly, the CITY/PARISH and its agents engaged in a pattern, custom, and practice of retaliatory intimidation, threats, and disciplinary and legal consequences against critics. These related patterns, customs, and practices were the moving force for the Defendants' unconstitutional treatment of Plaintiff and other protesters in July of 2016.

### 2.  EBRSO's History of Police Misconduct

42.     Similar to BRPD, the East Baton Rouge Sheriff's Office has its own history of allegations of excessive force, unconstitutional arrest, retaliation, and intimidation that have been leveled against EBRSO and Defendant GAUTREAUX since GAUTREAUX's election as Sheriff in 2007, including multiple instances of excessive force involving the use of firearms, Tasers, pepper spray, and punching and kicking of arrestees.

43.     These allegations include:  the 1992 shooting death of Chauncey Thomas, an unarmed Black 15-year-old, by a Sheriff's deputy; the 2005 shooting death of Gerry Stampley, a Black man, by EBRSO deputies and the retaliatory demotion, transfer, intimidation, and

disparagement of a Black EBRSO homicide detective who questioned whether the shooting was justified; the 2007 illegal stop of Joseph Davis, a Black motorist, in which EBRSO deputies allegedly choked, handcuffed, tased, pepper sprayed, and kicked Davis in the head and face without any legal justification, causing him to lose consciousness; and the allegedly unjustified tasing and unlawful arrest of Aaron Martinez while an EBRSO deputy responded to a complaint of trash-burning involving Martinez's neighbor in 2010.

### B. Baton Rouge Area Residents Protest Police Violence after the Killing of Alton Sterling by the BRPD.

44.     The killing of Alton Sterling was documented on video, which showed Mr. Sterling being forcibly restrained on the ground and then shot. Mr. Sterling's death provoked local, national, and international outrage.

45.     By the evening of July 6, 2016, Baton Rouge residents, a vast majority of whom were Black, gathered for what became daily and nightly vigils and peaceful protests at various locations throughout the city.

46.     Between July 6 and 10, 2016, thousands of people protested throughout Baton Rouge. Some paid their respects in front of the Triple S Food Mart where Mr. Sterling was killed. Others marched to and from the State Capitol. Many, including the Plaintiff, protested on a sizeable grassy lot adjacent to the intersection of Airline Highway and Goodwood Boulevard in Baton Rouge, across the street from the headquarters of the BRPD. Protesters chanted and held signs. Some of the protesters' chants and signs were specific to Mr. Sterling; others decried the history and pattern of brutal and racialized policing in Baton Rouge, of which Mr. Sterling's killing was the latest, particularly egregious example.

47.     The majority of these protesters were Black residents of Baton Rouge and the surrounding parishes. Many of them chose to protest because of their personal experiences or the

experiences of their loved ones with law enforcement, and particularly members of the BRPD and EBRSO, which left them hurt or afraid. National television and internet audiences closely followed the protests and Defendants' response to the protests.

**C. Defendants' Planned and Coordinated Effort to Suppress Dissent Through Unconstitutional Law Enforcement in July 2016.**

48.     In response to the protests and the national spotlight on protesters' nonviolent, lawful resistance, the Defendants and their agents developed and implemented a strategy, motivated by racial animus, to silence this peaceful and lawful exercise of First Amendment rights. This coordinated strategy ratified, validated and encouraged the continued use of intimidation, excessive force, illegal arrests, illegal detention, denigration, and criminalization.

49.     In multiple policy-making venues before and during the time of the protests of July 7-10, 2016, Defendants and their agents developed and implemented their coordinated strategy to silence Black dissent. These venues included, among others, the Mayor's Office of Homeland Security ("MOHSEP"),  the Governor's Office of Homeland Security and Emergency Preparedness ("GOHSEP"), and the Louisiana Sheriff's Association ("LSA").

50.     The CITY/PARISH, through policymakers Holden, Dabadie, and GAUTREAUX, facilitated and participated in planning meetings held at GOHSEP on several occasions between July 6 and 10, 2016, in order to formulate and implement agreement as to how to suppress the protests occurring within the City/Parish.

51.     The CITY/PARISH, its agents, and GAUTREAUX implemented the City/Parish's Emergency Operations Plan ("EOP") through MOHSEP. Under the terms of the EOP and EBRSO's internal policies, Defendants and their agents coordinated law enforcement response to emergencies, which are defined to include "civil disturbances."

52.    Pursuant to the Defendants' plan, numerous law enforcement agencies contributed personnel and resources to create a massive police presence to confront those engaging in peaceful protest and to suppress the rights of Black citizens and residents of Baton Rouge to petition the government for redress of grievances.

53.    The plan of Defendants and their agents and accomplices, sought to:  (a) create an intimidating law enforcement response that was militarized, in furtherance of which police personnel wore and used riot gear and carried rifles, shields, and/or batons while confronting the protesters; (b) effectuate the maximum number of arrests of innocent protesters, so as to send a message to Black citizens and residents of Baton Rouge that dissent would not be tolerated; (c) target certain protesters for arrest, based on these protesters' supposed group affiliations (in particular, affiliation with Black political and social organizations) and/or Defendants' belief that they were "leaders" of the spontaneous protests; (d) book protesters *en masse* on false criminal charges and to maximize the time those arrested spent in custody as punishment for defying law enforcement; (e) ensure officers used excessive physical force to effectuate these illegal arrests; (f) insulate individual officers from accountability, criticism or consequence for their role in Defendants' scheme by encouraging and/or allowing officers to cover the names and badge numbers on their uniforms with opaque tape and to refuse to give their names or badge numbers when asked directly by civilians; and (g) discourage individuals from protesting in the future through a display of militarized police violence and intimidation.

54.    Between July 6 and 10, 2016, Baton Rouge area law enforcement officers and their agents, including BRPD, EBRSO, LSP, and deputy sheriffs of surrounding parishes, put this plan into action. In furtherance of the above objectives, Defendants and their agents

unlawfully arrested approximately 200 protesters as they engaged in peaceful protest protected by the First Amendment. Plaintiff was among those arrested.

### D. The Unconstitutional Arrest and Confinement of the Plaintiff Travis Day

55.     Plaintiff TRAVIS DAY is a person of the full age of majority who is a resident of Baton Rouge. Mr. DAY arrived at Airline Highway and Goodwood Boulevard on the afternoon of July 9, 2016 to protest the killing of Alton Sterling and the injustice of the criminal justice and law enforcement system in Baton Rouge.

56.     At the protest location, members of the BRPD as well as other law enforcement agencies blocked traffic on Airline Highway. Some officers used and wore "riot gear," including body armor, shields, masks, and batons. Some officers carried rifles. Protesters stood in the grass and on the curb adjacent to Airline Highway and Goodwood Boulevard, chanting and holding signs.

57.     Mr. DAY stood on the side of the road along Airline Highway near its intersection with Goodwood Boulevard for an extended period after he arrived, at times speaking out in protest, but mostly filming the interactions between the other protestors and the police. He was instructed by law enforcement officers on multiple occasions to stay out of the street and on the grass, and he followed those instructions.

58.     Without warning, scores of law enforcement officers, wearing riot gear, some with rifles, began marching down Airline Highway.

59.     Mr. DAY was continuing to stand next to the road, not on the roadway, when suddenly and without warning a BRPD officer grabbed him from behind, and with his arm around Mr. DAY's neck, causing Mr. Day to be unable to breathe, dragged him to the ground. Upon being dragged to the ground, Mr. Day was struck forcefully in the face multiple times with

a hard object which caused bleeding and eventual scarring. He was then dragged through the grass and repeatedly kicked for a long distance while being manhandled toward the BRPD Headquarters driveway, where he was eventually handcuffed.

60.    Despite the fact that he was not on the roadway during the protests, BRPD officers charged TRAVIS DAY with Simple Obstruction of a Highway in violation of La. R.S. § 14:97.

61.    BRPD officers placed Mr. DAY into a bus for an extended period, during which time his arms were handcuffed so tightly as to cause extreme pain to Mr. Day. Mr. Day was eventually transported from the BRPD headquarters to the East Baton Rouge Parish Prison, where he was confined for hours in uncomfortable, unsanitary conditions, and without proper bedding, and was not offered any food until the following day.

62.    There was no basis to arrest, confine or charge Mr. DAY. He had not committed any crime.

63.    On information and belief, no law enforcement officer swore out a probable cause affidavit against TRAVIS DAY.

64.    On July 15, 2016, the East Baton Rouge District Attorney announced that his office would refuse the charges against Mr. DAY.

### E. The Policies and Practices of the City/Parish, the Baton Rouge Police Department and the East Baton Rouge Sheriff's Office Caused the Violations of Plaintiff's Constitutional Rights.

65.    The policies and practices of the City/Parish, the BRPD, and the EBRSO were a moving force behind and a contributing cause of the constitutional violations that Plaintiff suffered.

66.     The BRPD and the EBRSO employed the following well-settled, inter-related *de facto* and explicit policies and practices to suppress Plaintiff's exercise of his First Amendment rights and Fourth Amendment rights and to otherwise violate Plaintiff's constitutional rights:

A.     racially discriminatory policing, including the targeting of Black citizens with excessive force and unconstitutional arrest and disparate treatment of citizens based on race in matters other than arrest;

B.     the criminalizing and shaming of individuals who criticize law enforcement;

C.     the control, frustration, and termination of organized protest and dissent through the targeting for arrest, detention, abuse, and denigration of perceived protest "leaders" and, in particular, individuals who criticize the police;

D.     failing to create and implement clear, understandable policies for the benefit of sworn police personnel regarding how to respond constitutionally to mass demonstrations and spontaneous protest;

E.     failing to create and implement clear, understandable policies for the benefit of sworn police personnel regarding the importance of protecting and respecting the exercise of First Amendment rights through assembly and protest;

F.     failing to train sworn personnel on the importance of protecting and respecting the exercise of First Amendment rights through assembly and protest;

G.     failing to supervise personnel to ensure that personnel execute their duties in a constitutional manner and without violating the rights of protesting individuals under the U.S. Constitution, the Constitution of Louisiana, and statutory law;

H.     failing to sufficiently distinguish in written policies regarding "Special Events" and "Civil Disorder" between unlawful "civil disorder" or "riot," on the one hand,

and the exercise of the constitutionally protected right of free speech, regardless of compliance with burdensome permitting processes, on the other hand;

I.    the use of riot gear—i.e., military armaments—such as shields, helmets with facemasks, body armor, batons, rifles, and military vehicles without just cause and in order to frighten and intimidate those who wish to peacefully assemble to voice their concerns on issues of public importance, thereby creating an atmosphere of tension;

J.    failing to discipline sworn personnel who use excessive force, engage in racist policing, prepare false reports, falsely arrest citizens, and/or violate First Amendment rights, thereby creating a culture of impunity in which officers who commit such misconduct learn that they will suffer no adverse consequences;

K.    tacitly approving and supporting a police code of silence, whereby officers are expected to protect and shield other officers who are accused of misconduct, such as excessive force, racist policing, preparation of false reports, false arrest of citizens, and/or violations of First and Fourth Amendment rights and other constitutional and statutory rights;

L.    allowing a widespread practice of excessive force, directed particularly at Black citizens and residents, to continue unabated, despite notice of the pattern and the full knowledge of policymakers;

M.    failing to create and implement policies and failing to train sworn personnel regarding how to identify the crime of Simple Obstruction of a Highway of Commerce and apply the statute in a manner that respects the First Amendment rights of Black citizens and residents of Baton Rouge;

N.      failing to create and implement a "street closure" permitting process to enable those who wish to engage in demonstrations on matters of immediate public importance to obtain a permit on an emergency basis (i.e., with waiver of the 45 day notice requirement);

O.      imposing onerous financial conditions on those who seek to engage in protest— e.g., requiring proof of $1 million in liability insurance coverage and a receipt for rental of barricades.

67.    At all pertinent times herein, Defendants and their agents knew or should have known that the policies, procedures, practices, customs, and usages they established for the CITY/PARISH, BRPD, and EBRSO would result in violations of constitutional rights. These defendants ignored that risk and acted unreasonably, intentionally, and with knowing disregard for Plaintiff's constitutional rights as described above.

68.    The policies and practices of the CITY/PARISH, BRPD, and EBRSO listed in ¶ 20-43, 53, and 66 above were implemented and applied intentionally with knowing disregard for the rights of Plaintiff.

69.    The policies and practices of the CITY/PARISH, BRPD, and EBRSO listed in ¶ 20-43, 53, and 66 were implemented by Defendants and their agents, working in concert and motivated by racial animus, to suppress the right of Black citizens and residents of Baton Rouge to petition the government for redress of grievances.

**F. Damages.**

70.    Plaintiff has been damaged as a result of Defendants' actions alleged herein. Plaintiff has suffered physical pain and extreme emotional distress and anguish as a result of

being brutally arrested, detained and imprisoned, not on suspicion of committing a crime, but solely for exercising his right to lawful protest under the First Amendment.

71.    He suffered shame, pain, humiliation and embarrassment from being handcuffed, imprisoned, and treated as a criminal in front of community members, loved ones, employers, the media, and viewers of local and national television and Internet broadcasts of the protests. Moreover, his name was included in the East Baton Rouge District Attorney's Office press release when that Office made the decision to refuse the charges against the Plaintiff and nearly 100 other arrestees.

72.    Plaintiff suffered significant financial damage as a result of missing work and being ultimately fired due to being incarcerated on Defendants' trumped up criminal charges. Plaintiff suffered the inability to continue to provide for the care of his children due to the financial struggles precipitated by Defendants' unlawful arrest and detention.  Plaintiff also suffered additional physical damage from being subject to unreasonable force during his arrest, and being denied necessary medical care while incarcerated in the East Baton Rouge Parish Prison.

73.    Plaintiff continues to suffer deep psychological pain as a result of Defendant's actions.

74.    Plaintiff remains fearful of law enforcement and of being subjected to random acts of state-condoned violence in the future, either during lawful protests or solely by virtue of being a member of Baton Rouge's Black community, due to Defendants' on-going racist policing policies.

## V. CLAIMS

## DEFENDANTS' JOINT AND SEVERAL LIABILITY ON ALL CLAIMS

75.     Plaintiff incorporates the factual allegations of the preceding paragraphs.

76.     For Counts One through Seventeen alleged below, all Defendants in each count are liable jointly and severally, or in solido for Plaintiff's injuries.

77.     First, each of the individual Defendants, acting in concert with one another and other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means; among other things, to unlawfully detain, arrest, and imprison the Plaintiff for the purpose of silencing dissent against police practices. Each of the Defendants and their agents committed specific overt acts in support of this conspiracy. Each Defendant is therefore liable for all actions of any other Defendant and his agents taken in furtherance of the conspiracy.

78.     Second, the actions of individual Defendants who are BRPD officers or EBRSO deputies were taken in the course and scope of their employment. For Counts Eight to Fourteen, which arise under Louisiana law, Defendants CITY/PARISH, BROOME, and GAUTREAUX are vicariously liable for actions of their employees, agents, and co-conspirators.

## COUNT ONE

## 42 U.S.C. § 1983 CLAIM FOR CIVIL CONSPIRACY TO VIOLATE CIVIL RIGHTS OF PROTESTERS

79.     Plaintiff incorporates the factual allegations of the preceding paragraphs.

80.     Each of the individual Defendants, acting in concert with one another and other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by unlawful means.

81.     The Defendants and their agents took concrete steps to enter into an agreement in July 2016 to unlawfully detain, arrest, and imprison Plaintiff, knowing they lacked probable cause to do so, and for the purpose of impeding Plaintiff from exercising his First Amendment rights to protest by engaging in non-disruptive speech in support of an issue of pressing public importance.

82.     In furtherance of this conspiracy, each of the Defendants and their agents committed specific overt acts, misusing their police powers for the purpose of unlawfully silencing Plaintiff. They accomplished this goal by giving orders to arrest protesters (including Plaintiff), using excessive force to unlawfully effect Plaintiff's arrest, fabricating evidence against Plaintiff, and approving trumped up charges against him, which resulted in his unlawful imprisonment.

83.     Additionally, the agents of the Defendants, whether or not involved in any specific arrest of the Plaintiff, by their presence at the corner of Airline and Goodwood, or performing support to Defendants and co-conspirators on Airline and Goodwood, implemented the conspiracy by providing support, assistance, and encouragement to those agents of the Defendants who actually performed, processed or otherwise participated in the arrest of the Plaintiff.

84.     In the implementation of the conspiracy, the officers and deputies of the law enforcement agencies led at that time by CITY/PARISH agents Holden, Dabadie, and GAUTREAUX employed the customs, usages and policies of racially discriminatory policing set forth above in ¶¶ 20-43, 53 and 66.

85.     As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of

liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

86.    Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

## COUNT TWO
## 42 U.S.C. 1985(3) CLAIM FOR RACIALLY-MOTIVATED CIVIL CONSPIRACY TO DENY BLACK CITIZENS AND RESIDENTS THE EQUAL PROTECTION OF THE LAWS AND EQUAL PRIVILEGES AND IMMUNITIES UNDER THE LAW, INCLUDING THE RIGHT TO PETITION THE GOVERNMENT FOR REDRESS OF GRIEVANCES

87.    Plaintiff incorporates the factual allegations of the preceding paragraphs.

88.    Each of the Defendants acting in concert with one another and other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by unlawful means, as described in Count One, above.

89.    The purpose of this conspiracy was to deprive of equal protection of the laws, as guaranteed to them by Fourteenth Amendment, those Black citizens and residents who engaged in protest and to deny them the privileges and immunities of liberty and the right to petition the government for the redress of grievances guaranteed by the First, Fourth and Fourteenth Amendments.

90.    Defendants and their agents conspired with racial animus toward Plaintiff and other Black citizens and residents of Baton Rouge who were protesting the shooting death of Alton Sterling, a Black man, at the hands of Baton Rouge police. The conspiratorial agreement was effectuated as part of a long-standing pattern of racially discriminatory and racially targeted policing in the Baton Rouge area.

91.    As a direct and proximate result of Defendants' racially motivated conspiracy, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish,

humiliation, loss of liberty, loss of income, loss or destruction of property, and legal expenses, as set forth more fully above.

92.    Each individual Defendant is therefore liable for the violation of Plaintiff's rights by any other individual Defendant.

## COUNT THREE

## 42 U.S.C. § 1983 CLAIMS FOR FALSE DETENTION, ARREST, AND IMPRISONMENT IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS

93.    Plaintiff incorporates the factual allegations of the preceding paragraphs.

94.    The actions by Defendants and their agents in falsely detaining, arresting, and imprisoning Plaintiff without reasonable suspicion or probable cause violated Plaintiff's Fourth Amendment rights to be free from unreasonable search and seizure, pursuant to 42 U.S.C. § 1983.

95.    The actions of Defendants were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of income, loss or destruction of property, and legal expenses, as set forth more fully above.

## COUNT FOUR

## 42 U.S.C. § 1983 CLAIMS FOR EXCESSIVE USE OF FORCE

96.    Plaintiff realleges the factual allegations of the preceding paragraphs.

97.     Defendants employed excessive and unreasonable force, or caused excessive and unreasonable force to be employed, in arresting Plaintiff, as specifically alleged above, in violation of Plaintiff's rights under the Fourth Amendment.

98.    The actions of Defendants were the direct and proximate cause of the violations of Plaintiff's Fourth Amendment rights, bodily injury, pain, suffering, mental distress, anguish,

humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

## COUNT FIVE

### 42 U.S.C. § 1983 CLAIMS FOR RETALIATORY ARREST IN VIOLATION OF FIRST AMENDMENT RIGHTS

99.     Plaintiff realleges the factual allegations of the preceding paragraphs.

100.    Plaintiff was engaged in lawful First Amendment activity on the public streets and sidewalks of the City of Baton Rouge on July 9, 2016. Plaintiff was acting reasonably within time, manner, and place restrictions and was not provided any alternative channels for his expression.

101.    Defendants lacked probable cause to arrest Plaintiff.

102.    Defendants arrested Plaintiff or caused Plaintiff to be arrested in retaliation for his exercise of First Amendment rights, including in particular, his vocal criticism of racially discriminatory policing and police violence on the part of law enforcement.

103.    Alternatively, Defendants' arrest of Plaintiff, even if not in retaliation, still constituted a violation of Plaintiff's First Amendment rights to engage in spontaneous and non-disruptive speech in a public way, on a matter of pressing public importance.

104.    The actions of Defendants were the direct and proximate cause of the violations of Plaintiff's First, Fourth and Fourteenth Amendment rights, bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

## COUNT SIX

### 42 U.S.C. § 1983 CLAIM FOR AS-APPLIED CHALLENGE TO LA. R.S. § 14:97

105.    Plaintiff realleges the factual allegations of the preceding paragraphs.

106.    BRPD officers arrested Plaintiff for alleged violation of La. R.S. § 14:97.

107.    As applied in the arrest of Plaintiff in Baton Rouge on July 9, 2016, La. R.S. § 14:97 criminalizes Plaintiff's exercise of his rights to freedom of expression and assembly in public streets. Defendants' application of the statute is so broad as to criminalize marches, demonstrations, or picketing in the roadway, sidewalks, neutral ground, and other traditionally public fora.

108.    Defendants' application of La. R.S. § 14:97 to detain Plaintiff or cause Plaintiff's detention was unconstitutional and violated Plaintiff's First and Fourteenth Amendment rights.

## COUNT SEVEN

### *MONELL* CLAIM FOR MUNICIPAL LIABILITY FOR VIOLATION OF PLAINTIFF'S CIVIL RIGHTS

109.    Plaintiff incorporates the factual allegations of the preceding paragraphs.

110.    Defendants acted individually and together, under color of law, to violate Plaintiff's rights as set forth in the preceding claims.

111.    CITY/PARISH, BRPD, EBRSO, and GAUTREAUX, and their agents, have developed and maintained policies, practices, procedures, customs, and usages exhibiting deliberate indifference to the constitutional rights of citizens and residents of the City/Parish, including but not limited to those policies, practices, procedures, customs, and usages described above, and in particular in ¶¶ 20-43, 53, and 66, which caused the violation of Plaintiff's rights as described herein and the resultant damages suffered.

112.    CITY/PARISH, BRPD, EBRSO, and GAUTREAUX, and their agents, had the power to prevent or aid in the prevention of the wrongs done and conspired to be done as described herein, yet failed or refused to do so, in violation of 42 U.S.C. § 1983.

113.    The actions and omissions of Defendants as described herein were done with knowing disregard for the constitutional rights of the Plaintiff. Defendants have acted maliciously, willfully, wantonly, and in reckless disregard of Plaintiff's rights.

114.    Moreover, the actions of Defendants were directed, condoned, and/or ratified by Holden, Dabadie, and GAUTREAUX, final policymakers for the CITY/PARISH, BRPD, and EBRSO.

115.    As a direct and proximate result of Defendants' actions, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

## COUNT EIGHT

### SUPPLEMENTAL STATE LAW CLAIMS FOR CIVIL CONSPIRACY TO VIOLATE PLAINTIFF'S RIGHTS

116.    Plaintiff incorporates the factual allegations of the preceding paragraphs.

117.    Defendants and their agents agreed amongst themselves to violate various rights, set forth more fully in Counts 9-14 below, as guaranteed to Plaintiff by Louisiana's Constitution and Civil law.

118.    Defendants and their agents, in accordance with their ultimate objective to suppress lawful forms of protest and dissent, entered this agreement with the intent to arrest and detain Plaintiff in violation of Plaintiff's rights and otherwise exploit the criminal process.

119.    In furtherance of this conspiracy, the Defendants and their agents committed specific overt acts, misusing their police powers for the purpose of unlawfully silencing Plaintiff. They accomplished this goal by giving orders to arrest protesters (including Plaintiff), using

excessive force to unlawfully effect Plaintiff's arrest, fabricating evidence against Plaintiff, and approving trumped up charges against him, which resulted in his unlawful imprisonment.

120.    Additionally, the Defendants and their agents, whether or not involved in any specific arrest of the Plaintiff, by their presence at the corner of Airline and Goodwood, or performing support to Defendants and co-conspirators on Airline and Goodwood, implemented the conspiracy by providing support, assistance, training, supervision, and encouragement to those officers who actually performed, processed or otherwise participated in Plaintiff's arrest.

121.    Defendants' agents, officers, and employees, were acting in the course and scope of their employment at all times relevant to this claim.

122.    As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

123.    Defendants are subject to solidary liability for the injuries caused to Plaintiff by acts in furtherance of their conspiracy.

### COUNT NINE

### SUPPLEMENTAL STATE LAW CLAIMS FOR VIOLATIONS OF THE FREE EXPRESSION PROTECTIONS OF THE LOUISIANA CONSTITUTION

124.    Plaintiff incorporates the factual allegations of the preceding paragraphs.

125.    Article I, Section 7 of the Louisiana Constitution, protects freedom of expression. Article I, Section 9 protects freedom of assembly and the right to petition the government for redress of grievances. Defendants' actions in arresting and detaining Plaintiff as described above interfered with their exercise of these fundamental rights, as guaranteed by Louisiana's Constitution.

126.    Defendants' agents, officers, and employees, were acting in the course and scope of their employment at all times relevant to this claim.

127.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

## Count Ten

### Supplemental State Law Claims for Violations of the Right to Privacy, the Right to be Left Alone, and the Rights of the Accused

128.    Plaintiff incorporates the factual allegations of the preceding paragraphs.

129.    Defendants' seizure of Plaintiff was unreasonable and without probable cause, constituting a violation of the right to be left alone and the right to privacy secured by Article I, § 5 of the Louisiana Constitution. The failure to promptly inform Plaintiff of the charges against him also violates Article I, § 13 of the Louisiana Constitution.

130.    Defendants were acting in the course and scope of their employment at all times relevant to this claim.

131.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

## Count Eleven

### Supplemental State Law Claims for Intentional Torts, Including Intentional Infliction of Emotional Distress, Assault, Battery, and False Imprisonment

132.    Plaintiff incorporates the factual allegations of the preceding paragraphs.

133.    Defendants and their agents intended to inflict a harmful or offensive contact upon Plaintiff in the process of arresting him. As the arrest and detention were unjustified by legal authority, Defendants have committed the intentional torts of assault, battery, false arrest and imprisonment. Defendants' militarized response to peaceful and lawful protests, and their mass arrest of protesters amount to extreme and outrageous conduct that caused Plaintiff severe emotional distress. Defendants knew or should have known that such distress would be the outcome of their actions and therefore are liable for intentional infliction of emotional distress.

134.    Defendants were acting in the course and scope of their employment at all times relevant to this claim.

135.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

## COUNT TWELVE
## SUPPLEMENTAL STATE LAW CLAIM FOR ABUSE OF PROCESS

136.    Plaintiff incorporates the factual allegations of all preceding paragraphs.

137.    Defendants abused the legal process by detaining Plaintiff pursuant to an arrest report that was false, and, on information and belief, without generating an affidavit asserting probable cause to support Plaintiff's arrest. Acting in the course and scope of their employment, Defendants printed boilerplate affidavits to manufacture probable cause before such probable cause could possibly exist. Defendants also authored and/or approved a false, misleading, or otherwise deficient arrest report related to Plaintiff's arrest.

138.    These actions by Defendants constitute willful acts in the use of a process not in the regular prosecution of the proceeding. Moreover, in arresting Plaintiff with no sworn statement purporting to establish probable cause for Plaintiff's arrest, Defendants were motivated by an ulterior purpose, specifically the suppression of Plaintiff's peaceful and lawful protest of police violence.

139.    Defendants' agents, officers and employees, were acting in the course and scope of their employment at all times relevant to this claim.

140.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

## COUNT THIRTEEN

## SUPPLEMENTAL STATE LAW CLAIM FOR ABUSE OF RIGHTS

141.    Plaintiff incorporates the factual allegations of all preceding paragraphs.

142.    Louisiana state law recognizes a cause of action for "abuse of rights" when the holder of a legal right or power exercises it predominantly for the purpose of harming another.

143.    Defendants and their agents, acting in the course and scope of their employment, acted under color of law to seize, search, arrest, and/or detain Plaintiff in violation of rights guaranteed to Plaintiff by the U.S. Constitution, the Louisiana Constitution, and Louisiana state law. Defendants exercised the power granted to them by state law—including the power to search, seize, arrest, and detain—exclusively for the purpose of harming Plaintiff, or with the predominant motive to cause harm to Plaintiff.

144.    Plaintiff were protesting lawfully and peacefully, and Defendants thus lacked a serious and legitimate motive to exercise their police powers against Plaintiff.

145.    Defendants further used the power granted to them as law enforcement officers in a manner that violates moral rules, good faith, and/or elementary fairness.

146.    Defendants exercised their rights for a purpose other than that for which the rights are granted; specifically, Defendants unconstitutionally and unlawfully terminated Plaintiff's exercise of his rights to, *inter alia*, assemble, participate in the exercise of free speech, and to petition the government for redress of grievances.

147.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employment and income, loss or destruction of property, and legal expenses, as set forth more fully above.

## COUNT FOURTEEN
### SUPPLEMENTAL STATE LAW CLAIMS FOR NEGLIGENT INJURY

148.    Plaintiff incorporates the factual allegations of all preceding paragraphs.

149.    Defendants owed a duty of care to Plaintiff to conduct lawful arrests, supported by probable cause, and free from the use of excessive force. Defendants' arrest and detention of Plaintiff violated the duty of care owed to Plaintiff and was a cause-in-fact of Plaintiff's injuries.

150.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights.

151.    Defendants' agents, officers and employees, were acting in the course and scope of their employment at all times relevant to this claim.

152.    As a direct and proximate result of Defendants' misconduct, Plaintiff suffered damages, including bodily injury, pain, suffering, mental distress, anguish, humiliation, loss of liberty, loss of employement and income, and legal expenses, as set forth more fully above.

## VI.   Jury Demand

153.   Plaintiff demands trial by jury.

## VII.   Prayer For Relief

WHEREFORE, Plaintiff prays that this Court awards him the following relief:

A.   A declaratory judgment that some or all of the customs, usages and/or policies alleged in paragraphs 20-43, 53, and 66 above violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

B.   A declaratory judgment that some or all of the customs, usages and/or policies alleged in paragraphs 20-43, 53, and 66 above violated Plaintiff's rights under Article I, §§ 5, 7, and 9 of the Louisiana Constitution of 1974.

C.   A declaratory judgment that Defendants' application of La. R.S. § 14:97 to detain Plaintiff or cause Plaintiff's detention was unconstitutional and violated Plaintiff's First and Fourteenth Amendment rights.

D.   Compensatory damages including an amount sufficient to compensate him for physical and emotional pain and suffering, lost wages, lost income, lost or damaged property caused by Defendants' actions as alleged herein.

E.   Equitable relief in the return of any and all personal items seized from Plaintiff, as well as the complete destruction of any and all samples taken from Plaintiff, analysis performed on Plaintiff or samples collected from Plaintiff, including but not limited to cheek swabs and finger prints, and any other documents, objects, and/or records generated as a result of Plaintiff's illegal arrest and detention.

F.   Attorneys' fees, costs, and judicial interest under 42 U.S.C. § 1988, 28 U.S.C. § 1920, and other such lawful authority; and

G.  Such further and additional relief as this Court may deem proper and just.

Respectfully Submitted, this the 23rd day of February, 2018.

/s/Gideon T. Carter III_____
Gideon T. Carter, III, La. Bar No. 14136
Co-Lead Counsel
PO Box 80264
Baton Rouge LA 70898-0264
(225) 214-1546 (p) / (225) 341-8874 (f)
gideontcarter3d@gmail.com

/s/ James W. Craig_____
James W. Craig, La Bar No. 33687
Co-Lead Counsel
Roderick & Solange MacArthur
Justice Center
4400 S. Carrollton Avenue
New Orleans LA 70119
(504) 620-2259 (p) / (504) 208-3133 (f)
jim.craig@macarthurjustice.org

/s/ Eric A. Foley_____
Eric A. Foley, La. Bar No. 34199
Roderick & Solange MacArthur
Justice Center (see above)
eric.foley@macarthurjustice.org

/s/ S. Mandisa Moore-O'Neal___
S. Mandisa Moore O'Neal, La. Bar No.
35256
1824 Oretha Castle Haley Blvd.
New Orleans LA 70113
(504) 931-8482 (p)
smandisa85@gmail.com

/s/ Emily Faye Ratner_____
Emily Faye Ratner, La. Bar No. 35289
7214 St. Charles Ave, Box No. 913
New Orleans, LA 70118
(504) 864-7861 (p) / (504) 861-5986 (f)
msemilyfaye@gmail.com

/s/ Mauricio Sierra_____
Mauricio Sierra, La. Bar No. 35560
The Sierra Law Firm, LLC
7214 St. Charles Ave., Box 913
New Orleans, LA 70118
(504) 864-7860 (p)
msierra1@gmail.com

ATTORNEYS FOR PLAINTIFF