# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**TRAVIS DAY**                                                    **CIVIL ACTION NO.**

**VERSUS**

                                                                 **17-328-EWD (CONSENT)**

**CITY OF BATON ROUGE, ET AL.**

### RULING AND ORDER

This case, like several others still pending, arises out of the arrest of a protestor following the police-involved shooting of Alton Sterling in Baton Rouge, Louisiana in the summer of 2016. The only remaining defendants, The City of Baton Rouge/Parish of East Baton Rouge (the "City") and Mayor Sharon Weston Broome, in her official capacity (the "Mayor") (collectively, "Defendants") have filed a Motion for Summary Judgment ("Motion")[1] seeking dismissal of all claims. Travis Day ("Plaintiff") has oppose the Motion,[2] and Defendants filed a reply memorandum.[3] Oral argument is not necessary. After carefully considering the law, the facts and evidence in the record, and the submissions of the parties,[4] the Motion will be granted in part and denied in part. [5] Almost one hundred pages of briefing and almost one thousand pages of exhibits establish that fact issues preclude summary judgment on most of Plaintiff's claims.

---

[1] R. Doc. 109.

[2] R. Doc. 134.

[3] R. Doc. 138.

[4] Regardless of whether an exhibit is specifically cited in this Ruling, the Court has reviewed and considered all exhibits filed by the parties, including entire deposition transcripts with the exhibits as submitted by the parties; expert reports and related documents; affidavits and attachments; videos; photographs; and other documents filed in the record, either manually or through the Court's CM/ECF system.

[5] On January 1, 2019, the parties filed a Consent to Proceed before a United States Magistrate Judge, R. Doc. 78, and on January 16, 2019, an Order of Reference was entered by the district judge referring this matter to the undersigned "for the conduct of all further proceedings and the entry of judgment in accordance with 28 USC § 636(c) and the foregoing consent of the parties." R. Doc. 79.

## I.    BACKGROUND

### A.    Summary of Plaintiff's Claims

Plaintiff's operative complaint alleges a municipal liability claim against Defendants under *Monell v. New York City Dept. of Social Services*[6] for purported violations of 42 U.S.C. § 1983, and Louisiana state law claims, arising from Plaintiff's arrest by several Baton Rouge Police Department ("BRPD") officers on July 9, 2016 during a protest in Baton Rouge, Louisiana in the wake of the July 5, 2016 shooting of Alton Sterling.[7] This suit is one of many pending in this Court stemming from the Baton Rouge protests.[8]

Plaintiff's Second Amended Complaint names the following defendants: (1) the City; (2) the Mayor; (3) East Baton Rouge Parish Sheriff Sid Gautreaux; and (4) Nova, the alleged insurer of the East Baton Rouge Sheriff's office.[9] The EBRSO Defendants moved to dismiss Plaintiff's claims against them for failure to state a claim under Fed. R. Civ. P. 12(b)(6). On April 10, 2019, the Court granted the motion and dismissed all claims against the EBRSO Defendants with prejudice.[10] Accordingly, the City and the Mayor are the only remaining defendants; no individual BRPD officers were sued.

---

[6] 436 U.S. 658, 98 S.Ct. 2018 (1978).

[7] The referenced protests occurred between July 8 and July 10, 2016.

[8] *See, e.g., Tennart et al. v. City of Baton Rouge, et al.*, United States District Court, Middle District of Louisiana, Civil Action No. 17-179; *Geller v. City of Baton Rouge, et al.*, United States District Court, Middle District of Louisiana, Civil Action No. 17-324; *Smith, et al. v. City of Baton Rouge, et al.*, United States District Court, Middle District of Louisiana, Civil Action No. 17-436; *Jackson v. City of Baton Rouge, et al.*, United States District Court, Middle District of Louisiana, Civil Action No. 17-438; *Imani, et al. v. City of Baton Rouge, et al.*, United States District Court, Middle District of Louisiana, Civil Action No. 17-439; and *Batiste-Swilley v. City of Baton Rouge, et al.*, United States District Court, Middle District of Louisiana, Civil Action No. 17-443.

[9] Sheriff Gautreaux and Nova are collectively referred to as the "EBRSO Defendants."

[10] R. Doc. 89. On November 28, 2018, following oral argument, the Court granted the EBRSO Defendants' Motion to Dismiss (R. Doc. 44), dismissed Plaintiff's claims against the EBRSO Defendants, and provided Plaintiff a period of twenty-eight (28) days to amend the operative complaint to state a cognizable claim against the EBRSO Defendants (R. Doc. 65). On January 22, 2019, Plaintiff filed a Notice of Intent to Proceed without Amendment to the Complaint (the "Notice"). R. Doc. 84. Per that Notice, Plaintiff advised the Court and defendants that Plaintiff "chooses not to amend his Complaint (ECF No. 30) at this time" and explained that "[w]hile Mr. Day disagrees with the Court's ruling dismissing his claims against EBRSO Defendants…, and does not waive his right to seek appellate review of that

Plaintiff alleges that he "was arrested on July 9, 2016, near the intersection of Goodwood Boulevard and Airline Highway for 'simple obstruction of a highway of commerce' while lawfully protesting the shooting death of Mr. Alton Sterling and racist policing in Baton Rouge."[11] Plaintiff claims that he was arrested on "false grounds,"[12] was "detained in the East Baton Rouge Parish Prison, subjected to harsh detention conditions," "labeled as a criminal without just cause,"[13] and that "[a]s a direct result of Defendants' actions and Plaintiff's arrest," he was terminated from his employment.[14] Plaintiff claims that his constitutional rights were violated because of the BRPD's "well-settled, inter-related *de facto* and explicit policies and practices."[15] He asserts claims pursuant to 42 U.S.C. §§ 1983,[16] 1985(3),[17] municipal liability pursuant to *Monell*,[18] and supplemental state law claims.[19] As Plaintiff has abandoned his conspiracy-related claims,[20] they are no longer before the Court and will not be discussed in this Ruling.

---

decision upon entry of final judgment in this case, he declined the opportunity to amend and wishes to proceed now with his claims against the City-Parish." *Id.* at p. 1. Thereafter, the Court dismissed all claims against the EBRSO Defendants with prejudice. R. Doc. 89.

[11] R. Doc. 30, ¶ 14.

[12] R. Doc. 30, ¶ 6.

[13] R. Doc. 30, ¶ 7.

[14] R. Doc. 30, ¶ 8.

[15] R. Doc. 30, ¶ 66.

[16] R. Doc. 30, ¶¶ 79-86 (civil conspiracy to violate civil rights of protestors); ¶¶ 93-95 (false detention, arrest, and imprisonment); ¶¶ 96-98 (excessive use of force); ¶¶ 99-104 (retaliatory arrest in violation of First Amendment rights); ¶¶ 105-108 (as-applied challenge to La. R.S. § 14:97).

[17] R. Doc. 30, ¶¶ 87-92 (claim for racially motivated conspiracy).

[18] R. Doc. 30, ¶¶ 109-115.

[19] R. Doc. 30, ¶¶ 116-123 (civil conspiracy to violate Plaintiff's rights); ¶¶ 124-127 (violation of the free expression protection of the Louisiana Constitution); ¶¶ 128-131 (violation of the right to privacy, the right to be left alone, and the rights of the accused); ¶¶ 132-135 (intentional torts of intentional infliction of emotional distress, assault, battery, and false imprisonment); ¶¶ 136-140 (abuse of process); ¶¶ 141-147 (abuse of rights); ¶¶ 148-152 (negligent injury).

[20] R. Doc. 134-1, n.1.

### B.    Undisputed Material Facts[21]

In July 2016, protests occurred in the Baton Rouge area in response to the officer-involved shooting of Alton Sterling. One such protest occurred on July 9, 2016, near BRPD headquarters located at the corner of Goodwood Avenue and Airline Highway.[22] Plaintiff attended this protest and arrived around noon.[23] There "wasn't many people [protesting] at first."[24] He started at the Circle K at the corner of Goodwood Avenue and Airline Highway.[25] Plaintiff was standing in the parking lot of Circle K and videotaping the events with his cellphone.[26]

At some point, Plaintiff moved across Goodwood Avenue and was protesting in the area in front of BRPD Headquarters.[27] Plaintiff was not at this location "long" before he saw protestors, including members of the New Black Panther Party, "coming up [Airline] Highway," marching toward BRPD Headquarters "from the mall."[28] Some members of the group of protestors "marching" down the southbound lanes of Airline Highway, which included members of the New Black Panther Party, were carrying guns.[29] This group of protestors stopped on Airline Highway near BRPD headquarters, still spread across both southbound lanes.[30] About that same time, law

---

[21] There are few undisputed facts, as the parties offer vastly different versions of the events surrounding Plaintiff's arrest on July 9, 2016. The parties' disputes encompass everything from genuine issues of material fact to the other party's word choices. *See, e.g.*, R. Doc. 109-2, ¶ 7 ("the plaintiff walked over from his original protest location to *meet up* with the NBP group") *versus* R. Doc. 134-1, ¶ 7 ("[Plaintiff's] testimony was that he '*wanted to go meet*' members of the New Black Panther Party"). Given that the Court must view the facts and evidence in the light most favorable to the non-movant—Plaintiff here, Plaintiff's deposition testimony and description of events will be used to describe the facts not genuinely in dispute.

[22] R. Doc. 109-2, ¶ 2; R. Doc. 134-1, ¶ 2.

[23] R. Doc. 134-14 (Day Dep.), at 19:15-20:11.

[24] *Id*. 21:16-18.

[25] *Id*. at 20:1-11.

[26] *Id*. at 20:12-25, 21:1-25.

[27] *Id*. at 20:19-21:12.

[28] *Id*. at 22:18-24:22.

[29] *Id*. at 25:14-18.

[30] *Id*. at 39:2-18.

enforcement officers blocked off a portion of Airline Highway and stood in the southbound lanes facing the protestors, who were also in the roadway.[31]

After the arrival of members of the New Black Panther Party, Plaintiff testified that he "wanted to go meet them."[32] Plaintiff walked toward the members of the New Black Panther Party and began protesting "alongside" of them.[33] Plaintiff testified that he was not holding a sign or participating in any chants led by members of the New Black Panther Party.[34] Rather, Plaintiff's chosen form of protest included his presence, videotaping the events with his cellphone, and "talking sh*t" to police.[35]

Plaintiff was not stationary while protesting in front of BRPD Headquarters. At various times, he was protesting "alongside" or "behind" members of the New Black Panther Party, while he was moving between the grass embankment and the curb along the southbound lanes of Airline Highway at other times.[36] Plaintiff's testimony--that he was on the curb (at least at some points)--is corroborated by multiple videos. The curb is at least two feet from the southbound lanes of travel on Airline Highway according to evidence offered by Defendants.[37]

At one point, Plaintiff was standing in the grass embankment along Airline Highway, facing away from the roadway and videotaping police officers.[38] He was again "talking sh*t" to

---

[31] *Id*. at 32:9-16.

[32] *Id*. at 23:1-21.

[33] *Id*. at 24:20-25, 26:2-28:7.

[34] *Id*. at 27:25-28:12.

[35] *Id*. at 28:1-29:17. In a cellphone video shot by Plaintiff, Plaintiff, referring to the police, said: "Them b**ches out here." *Id*. at 35:22-26:1, 36:18-23. He also told the police to "[f]**k with them," referencing the New Black Panther Party members, because "[t]hey were in the middle of the street." *Id*. at 39:9-40:1. *See also* Plaintiff's video, manually filed as Exhibit 6.

[36] *Id*. at 28:7:19-28:7 (testifying that he protested "alongside" of members of the New Black Panther Party); 44:22-24 ("I guess I was behind him."); 54:18-55:14 ("[I was] standing on the curb.");

[37] R. Docs. 109-15 – 109-17.

[38] R. Doc. 134-14 (Day Dep.), at 57:14-61:10.

police officers and called them "b\*\*ch-\*ss punk[s]."[39] Law enforcement officers began arresting protestors in an effort to clear the roadway, and one officer shoved Plaintiff, who remained in place.[40] After the shove, a separate BRPD officer—Officer Jared Neyland—approached Plaintiff from the rear and grabbed Plaintiff, and he and other BRPD officers "brought [Plaintiff] to his knees."[41] From there, the BRPD officers, including Officer Neyland and Officer James Thomas, put Plaintiff in the prone position, moved him to the "flat portion" of the grass embankment, removed/lifted him from the ground, handcuffed Plaintiff, and arrested him.[42] Plaintiff was then escorted to a bus to wait for processing and transportation to jail.[43]

Plaintiff was charged with violating La. R.S. § 14:97 using an affidavit of probable cause "template."[44] The East Baton Rouge Parish District Attorney's office declined to prosecute Plaintiff and dismissed the charges against him.[45]

### C.    Disputed Issues of Material Fact

Beyond those facts in the preceding section, the parties dispute nearly everything regarding the events of July 9, including: Plaintiff's location preceding and at the time of his arrest, including whether he stepped in the roadway or remained, at most, on the curb; his interaction with law enforcement officers, including those BRPD officers that arrested him; and his subsequent arrest,

---

[39] *Id.* at 49:8-17. *See also id.* at 28:1 – 29:17; Plaintiff's video, manually filed as Exhibit 6.

[40] *See* DeSalvo Video, manually filed as Exhibit 11, at 1:47 – 1:52.

[41] *Id.* at 62:12-64:23. *See also* DeSalvo Video, manually filed as Exhibit 11, at 1:55.

[42] *Id.* at 64:25-75:18. *See also* Stewart Video, manually filed as Exhibit 12, at 0:42-1:01.

[43] *Id.*

[44] R. Doc. 134-19.

[45] R. Doc. 30, ¶ 9; R. Doc. 109-1, p. 4; R. Doc. 134, p. 28.

including whether the officer's had probable cause, whether the force used to arrest him was excessive, and whether he sustained injuries as a result of the force used by BRPD officers.[46]

Further complicating matters are the numerous photographs and videos showing portions of the protests and Plaintiff's arrest.[47] Both sides rely on these videos, each claiming the videos "clearly" show that their version of events is correct. The United State Supreme Court has explained that video evidence can establish the propriety of summary judgment when the non-movant's version of an event was "so utterly discredited" by video evidence "that no reasonably jury could have believed him," such that the court "should have viewed the facts in the light depicted by the videotape."[48] The Fifth Circuit has described the *Scott* standard as follows: "a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account."[49] The videos attached as exhibits to the parties' respective submissions do not meet the *Scott* standard. Specifically, because these videos do not capture the entire incident from start to finish or from a single viewpoint, they do

---

[46] For example, whether Plaintiff ever entered the roadway is the subject of much dispute. Plaintiff testified that he "never" stepped foot in the roadway. R. Doc. 134-14 (Day Dep.), at 27:22-24. Defendants dispute this and claim that Plaintiff did, in fact, enter the roadway. The affidavit of probable cause associated with Plaintiff's arrest indicates Plaintiff entered the roadway twice. R. Doc. 134-19, p. 2. However, several officers involved in Plaintiff's arrest testified that they no longer have a specific recollection of Plaintiff's arrest or the events leading up to it. *See* n.167, *infra*. Further, both sides claim the photographic and video evidence support their version of events, despite that evidence not fully corroborating or contradicting either side's version for reasons discussed below.

[47] *See, e.g.*, R. Docs. 109-17 – R. Doc. 109-24; photographs and videos manually filed as Exhibit 8-2 and Exhibits 1-20.

[48] *See Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769 (2007). *But compare, Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 729-30 (5th Cir. 2018) (discussing and distinguishing *Scott* because "the videos [in the instant case] do not meet that difficult standard…[and] the videos do not favor one account over the other and do not provide the clarity needed to resolve the factual dispute presented by the parties' conflicting accounts.").

[49] *Darden*, 880 F.3d at 730 (citing *Scott*, 550 U.S. at 380). *See also Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (finding that video evidence did not meet the *Scott* standard because (1) the "video does not so blatantly contradict the version of events told by [plaintiff] that no reasonable jury could believe his version and (2) the "contents of the video are too uncertain to discount [plaintiff's] version of events…"); *Hegeman v. Harrison*, No. 18-613, 2019 WL 1277523, at *8-9 (E.D. La. Mar. 20, 2019) (finding that inconclusive video footage did not conclusively disprove the plaintiff's account of the incident.).

not fully corroborate or contradict the versions of the events advanced by either party. It cannot be said that the videos blatantly discredit Plaintiff's account of the incident.

## II.    LAW AND ANALYSIS

### A.    The Parties' Arguments

#### 1.    Defendants' Argument and Evidence

Defendants argue that all of Plaintiff's claims should be dismissed because Plaintiff cannot establish any of the elements necessary to hold Defendants liable under *Monell* for the actions of the BRPD officers who arrested him.[50] First, Defendants argue that the "de facto policies" named in Plaintiff's Complaint—of which there are many—"cannot satisfy the 'official policy' requisite of a *Monell* claim" because such "policies" are not "affirmative polic[ies], municipal statement[s], ordinance[s], regulation[s], or decision[s]."[51] Likewise, Defendants argue that Plaintiff cannot satisfy the first element of a *Monell* claim through custom (*i.e.,* a "pattern of misconduct") because he cannot establish "a sufficient frequency of similar specific incidents" compared to his treatment and arrest at the July 9 protest.[52] Second, Defendants argue that Plaintiff "has failed to allege, much less substantively demonstrate…a policymaker who can be charged with actual or constructive knowledge" of the "de facto policies" of which Plaintiff complains.[53] Third, Defendants argue that even if Plaintiff could establish the first two *Monell* elements, his claims

---

[50] 436 U.S. 658, 98 S.Ct. 2018 (1978). The elements of a *Monell* claim are (1) an official policy or custom; (2) a policymaker who can be charged with actual or constructive knowledge; and (3) a constitutional violation whose "moving force" is that policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). These elements are discussed in greater detail below.

[51] R. Doc. 109-1, pp. 5-8.

[52] *Id.* at pp. 8-14.

[53] *Id.*

nonetheless fail because the policies complained of were not the "moving force" behind the purported violations of Plaintiff's constitutional rights.[54]

In addition to arguing that Plaintiff cannot establish all the *Monell* elements, Defendants address each of the purported violations of Plaintiff's constitutional rights and his Louisiana state law claims—and argue that those claims fail for various reasons. Generally, Defendants' arguments can be summarized as follows: (1) the BRPD officers had probable cause to arrest Plaintiff,[55] (2) the amount of force used in arresting Plaintiff was reasonable under the circumstances and/or only caused "*de minimis*" injuries,[56] and/or (3) Plaintiff has not produced sufficient evidence to support his claims.[57]

Defendants support their Motion with various evidence, including (1) excerpts of the deposition of Plaintiff and several BRPD officers;[58] (2) BRPD General Orders;[59] (3) affidavits and documents attached to those affidavits relating to the training, internal affairs history, and/or discipline of certain BRPD officers;[60] and various photographs[61] and videos[62] purportedly depicting the protest, the area where Plaintiff was protesting, and/or Plaintiff's arrest. Defendants claim that the testimony, along with these documents, photographs, and videos "clearly" show that there are no material issues of fact and summary judgment is appropriate on all of Plaintiff's

---

[54] *Id*. at pp. 6, 8, 10.

[55] *Id*. at pp. 16-20 (relating to Plaintiff's false arrest and related state law claims); pp. 25-26 (relating to Plaintiff's First Amendment retaliation claim); p. 26 (relating to Plaintiff's as-applied constitutional challenge claim).

[56] *Id*. at pp. 20-25 (relating to Plaintiff's excessive force and related state law battery claim).

[57] *Id*. at pp. 29-31 (relating to Plaintiff's state law claims).

[58] *See* R. Docs. 109-3 – 109-6 (Exhibits A-D) and 109-16 (Exhibit N).

[59] *See* R. Docs. 109-7 – 109-9 (Exhibits E-G).

[60] *See* R. Docs. 109-10 – 109-13 (Exhibits H-K) and 109-15 (Exhibit M).

[61] *See* R. Docs. 109-17 – 109-24 (Exhibits 15-20) and manually filed Exhibits 15-17, 19-20 (which appear to be duplicates of R. Docs. 109-17 – 109-19 and 109-23 – 109-24).

[62] *See* videos and photographs manually filed Exhibits 1-20.

claims.

## 2.    Plaintiff's Opposition and Evidence

In his Opposition, Plaintiff argues that all record evidence, including the videos taken by BRPD officers, "refute [Defendants'] Motion for Summary Judgment."[63] Plaintiff discusses the policies, customs, and training failures he claims were the moving force behind the violation of his constitutional rights.[64] He focuses on Defendants' use of a "unified command structure," the use of BRPD's "mobile field force" and "racial overtones" in the creation/training of same, the mobile field force's targeting of "leaders" and "agitators," the use of pre-filled affidavits of probable to arrest protestors for violating La. R.S. § 14:97 (Simple Obstruction of a Highway of Commerce), and the order of Carl Dabadie, then-chief of BRPD, to "clear the roadway" on July 9.[65]

Next, Plaintiff addresses each of the constitutional violations he claims underlie the *Monell* claims.[66] His arguments that summary judgment is not appropriate are summarized as follows: the videos purportedly depicting the protest and Plaintiff's arrest "prove" (1) that he did not step into the roadway in violation of La. R.S. § 14:97, (2) that the BRPD officers lacked probable cause to arrest him for violating La. R.S. § 14:97 or any other offense, (3) that the BRPD officers who arrested him used excessive force and his injuries were not "*de minimis*," and (4) that he was targeted for arrest because he was exercising his First Amendment rights and criticizing police officers.[67] Plaintiff claims that Defendants' assertion that there are no genuine issues of material

---

[63] R. Doc. 134, p. 1.

[64] *Id*. at pp. 3-31.

[65] *Id*.

[66] *Id*. at pp. 32-50.

[67] *Id*. at pp. 1-2, 32-50.

fact is "untenable."[68]

Finally, like Defendants, Plaintiff has attached numerous—and voluminous—documents to his Opposition. Those documents include (1) an expert report,[69] (2) the declaration of, and a video taken by, a reporter who was near Plaintiff and also arrested on July 9,[70] (3) entire depositions of Plaintiff and various BRPD Officers,[71] along with some exhibits to certain depositions,[72] and protest briefings and operational logs from the Mayor's Office of Homeland Security and Emergency Preparedness.[73] Further, Plaintiff relies on the same videos relied on by Defendants that purportedly depict the protest and his arrest.[74]

### B.    Summary Judgment Standard

Pursuant to well-established legal principles, summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[75] "A 'material' fact is one that might affect the outcome of the suit under governing law,' and a fact issue is 'genuine' if the evidence is such that a reasonable jury could

---

[68] *Id*. at p. 2.

[69] R. Doc. 134-4 (Exhibit P-1B). *See also* R. Docs. 134-2 and 134-3 (Exhibits P-1 and P-1A).

[70] R. Doc. 134-5 (Exhibit P-2) and corresponding video filed manually.

[71] R. Docs. 134-6 – 134-14 (no exhibit numbers provided by Plaintiff). Although Plaintiff and Defendants only cite to specific portions of these transcripts, Plaintiff filed entire deposition transcripts into the record. Because of this, the Court reviewed and considered the entirety of these transcripts in reaching this Ruling.

[72] R. Docs. 134-17 – 134-20 (Exhibits 12, 14, 15, and 20 to Murphy's Deposition (R. Doc. 134-10)); R. Doc. 134-26 (Exhibit 26 to Osborne's Deposition (R. Doc. 134-12)); R. Doc. 134-22 – 134-31 (Exhibits 32-38, 41, 45-46 to Dabadie's Deposition (R. Doc. 134-7)).

[73] R. Docs. 134-15 – 134-16 (Exhibits 4-5).

[74] *See* n.64, *supra*, as well as a video take by Ryan Kailath, a journalist who was near Plaintiff at the time of his arrest and arrested by BRPD officers. *See* R. Doc. 134-5 and the "2 minutes leading up to my arrest" video filed manually as Exhibit 8-2.

[75] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

return a verdict for the non-moving party."[76] A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, that show that there is no genuine issue of material fact.[77] The court must deny a motion for summary judgment if the movant fails to meet his burden of showing that there is no genuine issue of material fact.[78]

If the moving party carries its burden of proof under Rule 56, the opposing party must direct the court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor.[79] This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence.[80] Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.[81] Summary judgment is appropriate in any case where the evidence is so weak or tenuous on essential facts that the evidence could not support a judgment in favor of the non-moving party.[82]

In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the

---

[76] *McCullough v. Wright*, --- Fed. Appx. ---, 2020 WL 5414536, at *2 (5th Cir. Sept. 9, 2020) (quoting *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (some internal quotations omitted)).

[77] *Celotex Corp.*, 477 U.S. at 322.

[78] *Turbacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

[79] *Anderson*, 477 U.S. at 248.

[80] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[81] *Celotex Corp.*, 477 U.S. at 323.

[82] *Little*, 37 F.3d at 1075.

credibility of witnesses, weigh the evidence, or resolve factual disputes.[83]

### C.    Federal Claims under § 1983 and *Monell* Liability

§ 1983 creates a private right of action for redressing violations of federal law by those acting under color of state law.[84] It states, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...[85]

§ 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating rights conferred elsewhere.'"[86] Because § 1983 merely provides a remedy for designated rights, rather than creating any substantive rights, "an underlying constitutional or statutory violation is a predicate to liability."[87] To establish liability under § 1983, a plaintiff must satisfy three elements: (1) a deprivation of a right secured by the U.S. Constitution or federal law, (2) that occurred under color of state law, and (3) was caused by a state actor.[88]

Plaintiff's suit names no employees, just the Mayor and the City. Municipalities are included in the persons to whom § 1983 applies.[89]  A suit against a government official in her official capacity is the equivalent of suing the government agency of which the official is an

---

[83] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

[84] *See Migra v. Warren City School District Board of Educ.*, 465 U.S. 75, 82, 104 S.Ct. 892 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 19, 101 S.Ct. 2615 (1981).

[85] 28 U.S.C. § 1983.

[86] *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689 (1979)); *accord Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865 (1989); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427 (1985); *Jackson v. City of Atlanta, TX*, 73 F.3d 60, 63 (5th Cir. 1996); *Young v. City of Killeen*, 775 F.2d 1349, 1352 (5th Cir. 1985).

[87] *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted). *See also Hegeman*, 2019 WL 1277523, at *4.

[88] *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

[89] *Monell*, 430 U.S. at 690 (citation omitted).

agent.[90]  Accordingly, Plaintiff's claims against the Mayor are, in effect, also claims against the City. Thus, the Court must conduct a municipal liability analysis under *Monell*.[91]

There is no *respondeat superior* liability under § 1983.[92] "A municipality cannot be held liable simply by virtue of the fact that one of its employees violated a person's federal rights."[93] "Municipalities face § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury…'"[94] That is, "[a] municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.'"[95]

A plaintiff must show "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom."[96] The Fifth Circuit explained the "three ways of establishing a municipal policy for the purposes of *Monell* liability," as follows:

> First, a plaintiff can show "written policy statements, ordinances, or regulations." Second, a plaintiff can show "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." Third, even a single decision may constitute municipal policy in "rare circumstances" when the official or entity possessing "final policymaking authority" for an action "performs the specific act that forms the basis of the § 1983 claim."[97]

"[W]hether a particular official has final policymaking authority is a question of *state*

---

[90] *Burge v. Parish of St. Tammany,* 187 F.3d 452, 466 (5th Cir. 1999).

[91] *See Nowell v. Acadian Ambulance Service,* 147 F.Supp.2d 495, 501 (W.D. La. 2001) (citing *Turner v. Houma Mun. Fire and Police Civil Service Bd.*, 229 F.3d 478, 483 n.10 (5th Cir. 2000)).

[92] *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002).

[93] *Milam v. City of San Antonio,* 113 Fed. Appx. 622, 625 (5th Cir. 2004) (citing *Monell*, 436 U.S. at 663).

[94] *Pineda* 291 F.3d at 328 (quoting *Monell*, 436 U.S. at 694).

[95] *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010) (quoting *Piotrowski*, 237 F.3d at 578).

[96] *Id*. at 541-42 (quoting *Piotrowski*, 237 F.3d at 578).

[97] *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214-15 (5th Cir. 2019) (internal citations omitted).

*law*."[98] Moreover, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff" for the necessary determination to be made on the policy's relative constitutionality.[99] A single decision may create municipal liability if that decision is made by a final policymaker responsible for that activity, even if there is an officially-adopted policy to the contrary.[100]

As to the third element of a *Monell* claim, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."[101] "That is, 'the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'"[102] "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.'"[103] Additionally, "Plaintiffs must meet a heightened standard of causation in order to hold a

---

[98] *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702 (1989) (internal quotations omitted) (emphasis in original).

[99] *Piotrowski*, 237 F.3d at 579.

[100] *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) (internal quotations and citations omitted) ("When a final policy maker makes the relevant decision, and when that decision is within the sphere of the policy maker's final authority, the existence of a well-established, officially-adopted policy will not insulate the municipality from liability."); *Gonzalez v. Ysleta Indep. School Dist.*, 966 F.2d 745, 753-54 (5th Cir. 1993) (internal quotations and citations omitted) (discussing what constitutes an "official" policy under *Monell*, noting that official policy includes not only a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" but also "the actions of a municipality's lawmakers as well as those whose edicts or acts may fairly be said to represent official policy," and explaining that "it is well established that a municipality may be held liable for courses of action tailored to a specific situation and not intended to control decisions in later situations, provided that the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers.); *Pineda*, 291 F.3d at 328 (noting, "Early cases following *Monell* dealt with official policies or acts by a governing body fairly attributable as acts of the local government itself" but explaining that the Fifth Circuit has "marked two paths of proof" in *Monell* cases in the "absence of a 'smoking gun,'" including "[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers *or* by an official to whom the lawmakers have delegated policy making authority.").

[101] *Valle*, 613 F.3d at 542 (quoting *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct 1382 (1997)).

[102] *Id*. (quoting *Brown*, 520 U.S. at 411).

[103] *Id*. (quoting *Piotrowski*, 237 F.3d at 579).

municipality liable under § 1983."[104] To meet this heightened standard, a plaintiff must show that the policy of which he complains was the "'moving force' that caused the specific constitutional violation"—*i.e.*, he must establish a "'direct causal link' between the municipal policy and the constitutional injury."[105]  "The Supreme Court has explained that a municipality cannot be liable '[i]f a person has suffered no constitutional injury at the hands of the individual police officer.'"[106] Thus, official capacity claims "fail without an underlying constitutional violation."[107]

### D.    Application to Plaintiff's Claim for *Monell* Liability

Although Plaintiff appears to assert multiple claims, including a claim for *Monell* liability, across fourteen individual counts, the only named defendants remaining are the City and the Mayor. The City and the Mayor can only be liable under the framework established in *Monell*.[108] Accordingly, Plaintiff's claims are analyzed, below, to determine whether either Defendant can be liable for any policies that were the moving force behind any alleged constitutional violation.

---

[104] *Valle*, 613 F.3d at 546 (citing *City of Canton, OH v. Harris*, 489 U.S. 378, 391-92, 109 S.Ct. 1197 (1989)).

[105] *Id*. (quoting *Brown v. Bryant County*, 219 F.3d 450, 461 (5th Cir. 2000), and quoting *Brown*, 520 U.S. at 404).

[106] *Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (quoting *City of Los Angeles v. Heller*, 475 US 796, 799, 106 S.Ct. 1571 (1986)). *See also Malbrough*, 2020 WL 2507355, at *7 n.15 ("A municipality cannot be held liable when its employee did not violate the Constitution." (citing *Heller*, *supra*.)).

[107] *Whitley v. Hanna*, 726 F.3d 631, 648 (5th Cir. 2013) (citing *Bustos*, 599 F.3d at 467 ("Because [plaintiff has alleged no constitutional injury attributable to the Officers, [plaintiff] has failed to state a claim that a City policy was the moving force behind a violation of his constitutional rights.")).

[108] Defendants argue that Plaintiff's claims are "barred under the qualified immunity doctrine" because the "undisputed facts demonstrate the any BRPD officers involved in [P]laintiff's arrest are entitled to qualified immunity." R. Doc. 109-1, pp. 15-16. Plaintiff argues that qualified immunity is not applicable because he has not sued any individual BRPD officers, only "municipal representatives sued in their official capacities." R. Doc. 134, p. 21. "A municipality is not entitled to qualified immunity." *Estate of Sorrells v. City of Dallas*, 192 F.R.D. 203 (N.D. Tex. Feb. 25, 2000) (citations omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 243, 129 S.Ct. 808, 822 (2009) (noting that "[m]ost of the constitutional issues that are presented in § 1983 damages actions[, such as the application of qualified immunity,]…also arise in cases in which that defense is not available, such as…§ 1983 cases against a municipality…"); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5, 118 S.Ct. 1708 (1998) (noting that qualified immunity is unavailable "in a suit to enjoin future conduct, in an action against a municipality, or in litigating a suppression motion."). Likewise, "the personal defense of qualified immunity does not apply to official-capacity claims." *Stallworth v. Slaughter*, 436 Fed. App'x. 337, 340 (5th Cir. Aug. 8, 2011) (citations omitted). Nonetheless, to the extent Defendants are actually arguing that qualified immunity bars Plaintiff's claims because Plaintiff cannot show that the actions of any BRPD officer resulted in a deprivation of Plaintiff's constitutional rights, the Court addresses that argument through the *Monell* framework below.

### 1.    Policymaker with Actual or Constructive Knowledge

The Court will address the second *Monell* element first. "State law determines whether a particular individual is a county or municipality final decision maker with respect to a certain sphere of activity."[109]   Thus, the question is whether the Mayor or Chief Dabadie is a final policymaker for the City. Defendants do not appear to address this issue in the Motion. Regardless, Plaintiff alleges (1) that the Mayor is "responsible for the supervision, administration, policies, practices, procedures, and customs for the [City] and the City's police department," and (2) that the City, through "then-BRPD Police Chief Carl Dabadie was responsible for supervision, administration, policies, practices, procedures, and customs for the [City] and the [City's] police department."[110] Plaintiff further alleges that the City's prior mayor and/or Chief Dabadie were the final policymakers for the City with respect to law enforcement policies, practices, and customs, including those related to decisions made regarding how and when to arrest protestors in July 2016.[111] Specifically, Plaintiff alleges that the City, through its policymakers, including the former mayor and Chief Dabadie, "facilitated and participated in meetings held at GOHSEP on several occasions between July 6 and 10, 2016, in order to formulate and implement agreement as to how to suppress the protests occurring within the [City]."[112]

Regarding the Mayor, Plaintiff's specific claims against her are based on two conclusory allegations in the Complaint.[113] The Mayor is expressly mentioned only once in Plaintiff's entire

---

[109] *Bennett,* 74 F.3d at 586 (citations omitted).

[110] R. Doc. 30, ¶¶ 15-16.

[111] *See, e.g., id.* at ¶¶ 35-41, 50, 114.

[112] *Id.* at ¶ 114.

[113] *See* R. Doc. 30, ¶ 16 ("Defendant [Mayor]…is the Mayor-President of the City/Parish. She is responsible for the supervisions, administration, policies, practices, procedures, and customs for the City/Parish and the City's police department. She is responsible for the hiring, training, supervision, and control of BRPD officers…") and ¶ 78 ("Second, the actions of individual Defendants who are BRPD officers or EBRSO deputies were taken in the course and scope of their employment. For Counts Eight to Fourteen, which arise under Louisiana law, Defendants

Opposition.[114] Other than these conclusory allegations, Plaintiff has not provided sufficient evidence that the Mayor had final policymaking authority over any of the policies that are alleged to be the moving force behind any violation of Plaintiff's constitutional rights.[115] Because Plaintiff cannot establish the second *Monell* element as to the Mayor, Plaintiff's claims against the Mayor for *Monell* liability will be dismissed with prejudice.

Conversely, Chief Dabadie testified that his responsibilities as Chief of BRPD include "the vision, the planning, the discipline, [and the] policy making."[116] Chief Dabadie explained that all BRPD policies were "given to [him]" for consideration and approval.[117] Although Chief Dabadie also testified that he assigned some of his authority regarding the City's response to the July 2016 protests to Incident Commander Leach and relief Incident Commander Martin, according to those officers the chief maintained final authority.[118] Chief Dabadie also explained why the Mobile Field

---

City/Parish, [Mayor], and Gautreaux are vicariously liable for actions of their employees, agents, and co-conspirators.").

[114] R. Doc. 134, p. 1 at first sentence ("Defendant Sharon Broome, sued in her official capacity as Mayor of the City of Baton Rouge and President of East Baton Rouge Parish (Defendants or City) produced multiple videos of the July 9, 2016 protests…"). The "Mayor's office" is referenced two other times, both discussing the "unified command" that was set up to respond to the protests. *Id*. at pp. 4, 11.

[115] *See, generally*, R. Docs. 134-2 – 134-31 (Plaintiff's exhibits). While a few of these exhibits are purportedly from or related to the Mayor's Office of Homeland Security and Emergency Preparedness ("MOHSEP"), these documents do not establish that the Mayor (or the prior mayor) had knowledge of the contents described in these documents, nor do they establish that the mayor had final policymaking authority over any of the policies that Plaintiff's claims were the moving force behind violations of his constitutional rights. *See, e.g.*, R. Doc. 134-15 (MOHSEP briefing notes); R. Doc. 134-16 (MOHSEP Operational Logs); R. Doc. 134-31 (MOHSEP Synopses). Notably, several of the MOHSEP-related exhibits appear to have been exhibits used during Chief Dabadie's depositions.

[116] R. Doc. 134-7 (Dabadie Dep.), at 16:6-15.

[117] *Id*. at 29:10-30:4.

[118] *Id*. at 105:24 – 110:15 (testifying that he assigned Lieutenant Leach and Lieutenant Martin as the Incident Commanders for the July 2016 protest, that the Incident Commanders had "full authority to put people where they needed to be placed," and that he was "updated" by the Incident Commanders "on what we are doing or…what we did last night."). *See also* R. Doc. 134-8 (Leach Dep.), at 32:20-24 ("I answered directly to Chief Carl Dabadie"), 96:2-17 (testifying that as Incident Commander, he reported directly to Chief Dabadie, who was the "chief authority" and could countermand any orders given by Incident Commander Leach); R. Doc. 134-9 (Martin Dep.), 43:20 – 44:3 (explaining that as relief Incident Commander, he was "co-equal" with Incident Commander Leach). *See also* R. Doc. 134-10 (Murphy Dep.), 40:22 – 41:10 (testifying that "[t]he chief was over [the protest response in July 2016], and then other people he appointed that were way above me.").

Force was used to respond to the July 2016 protests.[119] Relatedly, other BRPD officers testified in their depositions that Chief Dabadie ordered BRPD officers, including those in the Mobile Field Force, to "clear the streets,"[120] and that they were instructed to arrest protesters who were in the street for violating La. R.S. § 14:97.[121]   Additionally, there was evidence submitted that Chief Dabadie supported the policy decisions made by his subordinates.[122]

Considering the party's submissions, along with the record evidence, Chief Dabadie was a final policymaker for the City,[123] who had actual and/or constructive knowledge of the policies that were alleged to be the moving force behind the constitutional violations at issue.[124]

---

[119] *Id.* at 33:7 – 36:11, 42:21 – 48:16.

[120] *See, e.g.*, R. Doc. 134-8 (Leach Dep.), 153:1-24 ("…the Mobile Field Force Unit was directed to clear the roadway…so the order was given to effect arrest to clear the roadway…"), 154:5-16 (explaining that the clear the roadway order came from the emergency operations unified command); R. Doc. 66 (Martin Dep.), 66:18-24 ("Q. Do you recall ever giving an order to clear the street, because a protest was no longer lawful? A. I may have said something like there are going to be arrests made and something. As soon as we have the resources to do it, then we will affect arrests."); R. Doc. 134-10 (Murphy Dep.), 49:20 - ("Q. Who was it who gave you that instruction about your role in detaining people who were in the street after verbal commands were given to leave the street? A. The chief on down. Q. So your understanding is that that direction came from the chief. A. It came from the chief. Q. But it would have been the captain who actually gave you that verbal command? A. There was several people out there, like I said, that he designated to give it. And then it was disseminated on down to captains, lieutenants, sergeants and us.").

[121] *See, e.g.*, R. Doc. 134-6 (Barron Dep.), 38:20 – 39:1 ("Q…Was there a point during the protests were there was discussion or instruction about charging people under 14:97, obstruction of a highway of commerce? A. I know if they were in the roadway, we were charging them with it. We were told to charge them with it if they were in the roadway."); R. Doc. 134-12 (Osborne Dep.), 30:6 – 33:24 ("Q. And at the time of the protests, were you given instruction about using 1497 versus the city statute? A. We were advised to use 1497. Q. And how was that direction to use 1497 communicated to you? A. Chain of command."); R. Doc. 134-10 (Murphy Dep.), 99:11-15 ("Q. And just for clarity, because you didn't say yes or no, was the Baton Rouge protest in July of 2016, the only time that you superiors gave you an instruction to arrest people under 1497? A. Yes.").

[122] R. Doc. 134-7, pp. 41-42 ("Q: So it would be – it's fair to say that in that statement you supported and reaffirmed the actions of your officers and your incident commander in the arrests made on Airline Highway on Saturday, July 9th? A: Yes.").

[123] *See Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989) ("As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury…Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur,…or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.").

[124] *See, e.g.*, *Hernandez v. Theriot*, 38 F.Supp.3d 745, 748 (M.D. La. Aug. 5, 2014) ("The court find that Police Chief Earl Theriot was the final decision maker with respect to law enforcement in Sorrento, and the alleged unconstitutional

### 2.    Official Policy, Practice, Ratification, and Failure to Train

Plaintiff has presented lots of documents he contends show that BRPD had multiple policies and practices that were the moving force behind his alleged constitutional violations and, as such, would support liability under *Monell*.[125] Specifically, Plaintiff points to BRPD General Orders Nos. 244 and 291, BRPD's decision to use the mobile field force, the decision to arrest protestors for violating La. R.S. § 14:97 using pre-filled affidavits of probable cause, and Chief Dabadie's order to "clear the roadway" during the protests.[126] Plaintiff also contends the Defendants' practice of excessive force and/or refusal to discipline those officers who were found to have used excessive force and Defendants' failure to train/supervise are policies that would support *Monell* liability. Plaintiff further contends that the Chief of BRPD ratified policy decisions made by his subordinates.

BRPD General Orders Nos. 244 and 291, the decision to use the Mobile Field Force in response to the July 2016 protests, the decision to arrest protestors for violations of La. R.S. § 14:97, and the order to "clear the streets," would either be "written policy statements, ordinances, or regulations" and/or single decisions by Chief Dabadie that "form the basis of the § 1983 claim."[127]  As this Court stated in a similar July 2016 protest case:

---

acts arose in connection with the Defendant's exercise of his law enforcement authority."); *St. Cyr v. McDonald*, No. 07-539, 2008 WL 11351306, at *6 n.13 (M.D. La. Sep. 17, 2008) ("Defendants do not contest that the New Road Chief of Police is the City's final policy maker in the area of local law enforcement for the City.").

[125] *See, generally*, R. Docs. 30, 134.

[126] *See* R. Doc. 134, pp. 1-12, 14-15. *See also* R. Doc. 109-1, pp. 6-14; R. Doc. 138, pp. 2-9. While these general categories do not specifically correspond to the policies set forth in the Second Amended Complaint, they are fairly reflected. *See, e.g.*, R. Doc. 30, p. 18, ¶ 66(I) as equivalent to decision to use Mobile Field Force; R. Doc. 30, p. 17, ¶¶ 66(C), (F) & (M) as equivalent to decision to arrest protestors for violating La. R.S. 14:97 using pre-filled probable cause affidavits; R. Doc. 30, pp. 17-18, ¶ 66(H) as equivalent to the decision to use General Orders 244 and 291; and R. Doc. 30, p. 17, ¶ 66(F) as equivalent to decision to order the roadway cleared.

[127] *Webb*, 925 F.3d at 214-15. To the extent any of these policies constitute a single decision, because Chief Dabadie has final law enforcement policymaking authority for the City, his decisions could constitute official policy. *See* n.124, *supra*, and *Bennett*, 74 F.3d at 586 .

> It is inconceivable that hundreds of officers from the Baton Rouge Police Department, East Baton Rouge Sheriff's Office, and Louisiana State Police and other law enforcement agencies put on riot gear, lined up with shields and assault rifles, deployed armored vehicles and arrested more than 100 people without direction and approval. The only explanation for nearly 100 people being charged with a single violation of simple obstruction of a highway of commerce under La. R.S. 14:97, is that the commanding officers issued orders to the BRPD, EBRSO, LSP and other law enforcement officers. The fact that 132 Affidavits of Probable Cause contain only two versions of boiler plate language confirms that a uniform policy was applied to all Baton Rouge protestors.[128]

The undersigned agrees. Between the deposition testimony regarding the use of the Mobile Field Force, the use of La. R.S. § 14:97, and the order to clear the roadway; BRPD General Orders; and the decision to use Affidavits of Probable Cause to support the arrest of Plaintiff (and other protestors) for violating La. R.S. § 14:97; Plaintiff has produced enough evidence for a reasonable jury to conclude that the first *Monell* element is satisfied as to these policies.

Second, Plaintiff attempts to establish *Monell* liability of the basis of purported customs and practices of Defendants. To make this showing, Plaintiff must prove there was a pattern, which "is tantamount to official policy when it is so common and well-settled so as to constitute a custom that fairly represents municipal policy."[129] "Where prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees."[130] "It is thus clear that a plaintiff must demonstrate 'a pattern of abuses that transcends the error made in a single case.'"[131] Indeed, "[a] pattern requires similarity and

---

[128] *See Geller v. City of Baton Rouge, et al.*, No. 17-324, at R. Doc. 114, at pp. 38-39 (Judge deGravelles' oral ruling on certain defendants' motion to dismiss).

[129] *Peterson v. City of Fort Worth, Texas*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579).

[130] *Id*. at 850 (citation omitted).

[131] *Id*. at 850-851 (citation omitted).

specificity; [p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."[132]

Moreover, a plaintiff must show "sufficiently numerous prior incidents" to establish a pattern.[133] For example, in *Pineda*, the Fifth Circuit held that "eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry."[134]

Plaintiff relies on six lawsuits where BRPD officers are alleged to have used excessive force, combined with single episode where a BRPD officer sent "a series of racist text messages…to a civilian" and was placed on administrative leave but resigned prior to any disciplinary action by BRPD, in his effort to establish BRPD's "practice or custom of excessive uses for force."[135] Specifically, the six lawsuits relied on Plaintiff include: (1) BRPD's arrest of Brian Townsend in 2007 for "loud music," where Townsend was "pepper spray[ed] and [subjected to] force that caused the rupture of Townsend's bladder"; (2) BRPD's arrest of Jon Leigh Shoulders in 2008 "for smoking marijuana, which resulted in Shoulders' skull being fractured and caused internal bleeding and permanent brain damage"; (3) a 2011 incident where BRPD shot and

---

[132] *Id*. at 851 (internal quotations and citation omitted).

[133] *Id*. at 851.

[134] *Id*. (discussing *Pineda*, 291 F.3d 325) (holding that "[e]leven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces.")). *See also Peterson*, 588 F.3d at 850 (concluding that the district court did not err when it determined that 27 complaints of excess force were insufficient to establish a pattern).

[135] R. Doc. 30, ¶¶ 34-35, 38-39. To the extent that Plaintiff is relying on the various statistics and statements—some attributed to non-parties, some attributed to unidentified individuals—alleged in his Complaint, such allegations have not been offered as evidence in opposition to the Motion, contain hearsay under Fed. R. Evid. 802, *et seq*., are not capable of being judicially noticed (save, perhaps, the Census Bureau statics) had Plaintiff requested such, and/or are not proper summary judgment evidence. *See, e.g.*, R. Doc. 30, ¶¶ 20-37, 39-41 (referencing the 2010 U.S. Census Bureau; statements purportedly made by unidentified Michigan and New Mexico law enforcement officers who assisted Baton Rouge in the wake of Hurricane Katrina in 2005; statements purportedly made by former Mayor Melvin "Kip" Holden and former BRPD Chief Dewayne White; alleged actions by former BRPD Chiefs Jeff LeDuff, Dewayne White, and Carl Dabadie; a "report" by Together Baton Rouge, a "coalition comprised of churches and community-based organization"; "a series of racist text messages sent by a BRPD officer to a civilian" and BRPD's response thereto; alleged but unspecified "repeated allegations of excessive force and unconstitutional arrest; and amounts the City has allegedly paid to settle excessive force cases in 2011, 2014, and 2015). Accordingly, this information was not considered by the Court in this Ruling.

killed Carlos Harris, "who was shot to death by an officer after Harris crashed a car that he'd been ordered by the officer to remove from the scene of a crime—despite Harris's informing the officer that he was intoxicated"; (4) a 2014 incident where BRPD was searching a home and "strip-searched Brett Percle, a visitor to the home" before "kick[ing] Percle with such force that his head slammed into the floor, knocking several teeth out"; (5) a 2015 incident where BRPD handcuffed (and arrested) a reporter and a producer of a local media company for "taking pictures of an arrest"; and (6) a 2016 incident where BRPD officers "held down" Ja'Colby Davis, a sixteen year old, and one officer "repeatedly punched [Davis] in the head."[136]

Defendants argue that the examples of police misconduct do not support Plaintiff's claim for *Monell* liability based on custom/practice.[137] Specifically, Defendants argue that the historical events and lawsuits relied on by Plaintiff are "readily distinguishable" from the present case—*i.e.*, not similar, and that "six legal actions over the course of nine years against the BRPD" are not sufficiently numerous to constitute a pattern. Additionally, none of the referenced historical events or lawsuits involve protestors or a mass demonstration. Defendants also argue that six legal actions over nine years are not so numerous or regular as to establish a pattern of excessive force by BRPD, much less one for which Defendants could be "attributed with knowledge that excessive force was an accepted practice of BRPD."[138] Further, according to Defendants, of the six lawsuits relied on by Plaintiff, only three occurred while Chief Dabadie was the head of BRPD, and only one of those three lawsuits resulted in a finding of excessive force.[139]

---

[136] R. Doc. 30, ¶ 38.

[137] R. Doc. 134-1, pp. 9-10.

[138] *Id*. at p. 10.

[139] *Id*. at p. 10 and n.28.

Defendants are correct. While the incidents relied on by Plaintiff are troubling in their own right, those incidents are not sufficiently numerous or similar to the facts of this case to constitute a custom or pattern under Fifth Circuit precedent. Six incidents over nine years are not sufficiently numerous to constitute a pattern. Likewise, none of those events involved mass protests or demonstration, protestors, the use of BRPD's Mobile Field Force, arrests made under La. R.S. § 14:97, and/or the application of BRPD General Order No. 291 (Civil Disorder) or BRPD General Order No. 244 (Planning for Unusual Occurrences). The prior incidents relied on by Plaintiff are insufficient to show a factual dispute regarding BRPD's customs or practices that Plaintiff claims support *Monell* liability. Accordingly, summary judgment on Plaintiff's claims is warranted to the extent those claims rely on BRPD's customs or practices.

Third, as to Plaintiff's claim that Chief Dabadie's alleged approval and ratification of the decisions of his subordinates in handling the July 2016 protests is a basis for establishing a policy, summary judgment is also warranted. While ratification by a final policymaker of a subordinate's decision and reasoning may make that decision chargeable to the municipality,"[140] whether such a decision can form the basis for *Monell* liability is limited to "extreme factual situations."[141] Additionally, the Fifth Circuit has "explained that a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality."[142]

---

[140] *Peterson*, 588 F.3d at 848 (citing *Praprotnik*, 485 U.S. at 127).

[141] *Id*. (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998) (finding that the shooting of a fleeing suspect hardly rose to such a level, particularly give the absence of evidence suggesting a culture of recklessness in the New Orleans Police Department).

[142] *Id*. (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1161-62 (5th Cir. 1986) (discussing *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985)—one of the extreme factual scenarios justifying ratification liability—and noting that *Grandstaff* involved a "highly peculiar set of facts," where officers, in response to a minor traffic violation, engaged in a three-patrol-car high speed chase during which the officers fired wildly at the suspected misdemeanant, who sought refuse at a ranch only to have the officers direct hails of gunfire at anything that moved, killing the innocent ranch owner, despite no evidence that anyone other than the officers fired a shot. After this "incompetent and catastrophic performance," involving "a whole series of abusive acts," the officers' supervisors "denied their failures and concerned themselves only with the unworthy, if not despicable, means to avoid legal liability." The *Coon* court

First, it is not clear that a ratification argument is even necessary since Plaintiff will be permitted to present evidence at trial regarding the BRPD General Orders Nos. 244 and 291, the decision to use the Mobile Field Force in response to the July 2016 protests, the decision to arrest protestors for violations of La. R.S. § 14:97, and the order to "clear the streets, as explained above. Additionally, even assuming Chief Dabadie's testimony that he "supported and reaffirmed the actions of [his] officers and [his] incident commander in the arrests made on Airline Highway made on Saturday, July 9th,"[143] is sufficient to constitute ratification of the BRPD officers' conduct, the facts underlying Plaintiff's claims, even considered in a light most favorable to Plaintiff, are not analogous to the extreme factual situation described in *Grandstaff*. Under the Fifth Circuit's standard, Plaintiff has failed to present any evidence of a factual situation extreme enough to impose liability on Defendants for Chief Dabadie's alleged ratification of his subordinates,' or other BRPD officers,' purported misconduct. Accordingly, summary judgment is appropriate as to all of Plaintiff's claims premised on a theory of ratification.

Fourth, Plaintiff tries to establish *Monell* liability based on BRPD's alleged failure to train and/or supervise its officers. To prevail on this claim, a plaintiff must show: "'(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'"[144] "In the context of failure-to-supervise claims, the Fifth Circuit has said: for a supervisor to be liable…the focus must be on the adequacy of the training

---

further noted, "the *Grandstaff* panel emphasized the extraordinary facts of the case and its analysis can only be applied to equally extreme factual scenarios.").

[143] R. Doc. 134-7 (Dabadie Dep.), 160:21 – 161:1. *See also* R. Doc. 134-1, ¶ 21 (citing R. Doc. 134-7, 160:21 – 161:1 and stating, "And the Chief explicitly ratified the decisions of the Incident Commanders.").

[144] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009)).

program in relation to the tasks the particular officers must perform."[145] "Moreover, 'for liability to attach based on an "inadequate training" claim, a plaintiff must allege with specificity how a particular training program is defective.'"[146]

This Court, quoting the Fifth Circuit, has explained deliberate indifference as follows:

> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Deliberate indifference requires a showing of more than negligence or even gross negligence. Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity. To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is obvious and obviously likely to result in a constitutional violation. It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, a supervisor might reasonably be found to be deliberately indifferent....

> We have stressed that a single incident is usually insufficient to demonstrate deliberate indifference. In *Cousin v. Small*, for example, we held that to succeed on his claim of failure to train or supervise the plaintiff must demonstrate deliberate indifference, which usually requires a plaintiff to demonstrate a *pattern of violations*. Similarly, in *Snyder v. Trepagnier*, we held that "proof of a single violent incident ordinarily is insufficient" for liability. Rather, the plaintiff must demonstrate at least a pattern of *similar incidents in which the citizens were injured.* Moreover, a showing of deliberate indifference requires that the Plaintiffs show that the failure to train reflects a "deliberate" or "conscious" choice to endanger constitutional rights.

---

[145] *Goodman*, 571 F.3d at 395 (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005) (internal quotations omitted)).

[146] *Id.* (quoting *Roberts*, 397 F.3d at 293) (dismissing failure to supervise and failure to train claims together); *see also Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005) (to satisfy deliberate indifference element of failure-to-train claim, a plaintiff must usually demonstrate a "pattern of violations" and that inadequate training is "obvious and obviously likely to result in a constitutional violation"); *Floyd v. City of Kenner*, 351 Fed. Appx. 890, 898 (5th Cir. 2009) ("[T]he pleadings must have sufficient precision and factual detail to reveal that more than guesswork is behind the allegation.") (internal citation omitted).

> Prior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question. That is, notice of a pattern of *similar* violations is required. While the specificity required should not be exaggerated, our cases require that the prior acts be fairly similar to what ultimately transpired[.][147]

Because Plaintiff cannot show a pattern of similar incidents for the reasons explained above, Plaintiff cannot show the Defendants were deliberately indifferent such that liability based on Defendants' purported failure to train and/or supervise likewise fails. This is true notwithstanding the factual dispute between the evidence of training failures relied on by Plaintiff—Dr. Kraska's report[148] and BRPD training slides[149]—and the testimony of multiple BRPD officers regarding their training, which includes training on the First and Fourth Amendments, probable cause and arrest procedures, use of force, and Louisiana statutes, such as La. R.S. § 14:97, as well as yearly in-service training on use of force/defensive tactics, use of force, and Taser training.[150]

---

[147] *Skinner v. Ard*, 2020 WL 699740, at *8-9 (M.D. La. Feb. 11, 2020), quoting *Clayton v. Colombia Cas. Co.*, 2012 WL 2952531, at *7 (M.D. La. July 19, 2012) (quoting *Estate of Davis*, 406 F.3d at 381–83).

[148] R. Doc. 134-4. Dr. Kraska opines, "to a reasonable degree of certainty based on [his] study of law enforcement practices in the US, that the following policy decisions, policy failures, and training failures resulted in the unlawful arrest and use of excessive force against Travis Day on June 9 [sic], 2016…2. BRPD's training of MFF and SWAT units in, and implementation of the practice of mass arrest as a means of dispersing protestors by seizing and arresting selected protestors through the manipulative and inconsistent use of roadway obstruction laws, thereby causing non-arrested protestors to flee the scene for fear of arrest and assault;…5. The failure to properly train and/or communicate operational personnel on the proper categorization of a public assembly under the "Miami Model" or otherwise…" "[A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's providence and is irrelevant." *Nassri v. Inland Dredging Co.*, No. 11-853, 2012 WL 5438993, at *2 (M.D. La. Nov. 6, 2012) (quoting *Owen v. Kerr-McGee Corp.*, 698 F.3d 236, 240 (5thCir. 1983). Here, Dr. Kraska concludes that numerous "policy decisions, policy failures, and training failures" resulted in the "unlawful arrest and use of excessive force against" Plaintiff. R. Doc. 134-4, p. 1. This is a legal conclusion based on Dr. Kraska's perception of the evidence, which this Court is not required to accept under Fed. R. Evid. 704.  Additionally, Dr. Kraska's report focuses on decisions and training regarding mass protests for which Plaintiff has failed to establish a pattern of similar incidents.

[149] R. Doc. 34-23 – R. Doc. 134-26. Specifically, Plaintiff argues that the Mobile Field Force training slides used Texas law rather than Louisiana law. R. Doc. 134-1, pp. 9-10. However, as multiple BRPD officers testified, they were trained on Louisiana law, including La. R.S. § 14:97 and similar statutes.

[150] *See, e.g.*, R. Doc. 134-9 (Martin Dep.), at 61:12 – 64:20; R. Doc. 134-8 (Leach Dep.), at 20:25 – 22:14; R. Doc. 134-13 (Thomas), at 12:25 – 15:19; R. Doc. 134-12 (Osborne), at 35:14 – 36:7. *See also* R. Doc. 109-10.

As there are no genuine issues of material fact regarding Plaintiff's claim for *Monell* liability based on Defendants' customs/practices, Chief Dabadie's ratification, or failure to train/supervise, summary judgment is appropriate, and all of Plaintiff's claims premised on Defendants' practices/customs, ratification, and failure to train/supervise will be dismissed with prejudice. However, there are genuine issues of material fact regarding Defendants' official policies, whether longstanding or single decisions made regarding the July 2016 protests.

### 3.    "Moving Force" Behind Plaintiff's Alleged Constitutional Violations

### a.    False Arrest

Plaintiff challenges his July 9, 2016 arrest under the First and Fourth Amendments. "A warrantless arrest without probable cause," or a false arrest, "violates clearly established law defining an individual's rights under the Fourth Amendment."[151] Individuals who protest are also protected under the First Amendment from retaliatory actions by government officials."[152] However, the law is clear that where an officer has probable cause to arrest an individual, "the objectives of law enforcement take primacy over the citizen's right to avoid retaliation."[153]

Probable cause exists where "facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[154] Accordingly, to establish that BRPD violated his constitutional rights on July 9 when

---

[151] *Hegeman,* 2019 WL 1277523, at *5 (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017) (citing *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013)). *See also Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) ("A warrantless arrest must be based on 'probable cause.' Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.").

[152] *Davidson*, 848 F.3d at 391(citing *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016)).

[153] *Id.* (quoting *Allen*, 815 F.3d at 245).

[154] *Id.* (quoting *Hogan*, 722 F.3d at 731). *See also Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009); *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004).

they arrested him, Plaintiff must show that those officers lacked probable cause to do so. Further, assuming Plaintiff can show that the officers lacked probable cause, to establish *Monell* liability, Plaintiff must also show that one of Defendants' policies was the moving force behind Plaintiff's July 9 arrest, which Plaintiff claims violated his constitutional rights.

Here, Defendants argue that the undisputed facts show that Plaintiff cannot establish any of the elements necessary to impose liability on them under *Monell* related to Plaintiff's July 9 arrest.[155] The Court has already addressed the first two elements of *Monell*—official policy and policymaker—and will focus on the last element—whether any of those policies are the moving force behind Plaintiff's alleged constitutional violation. Regarding this issue, Defendants argue that Plaintiff cannot establish the "moving force" element because the July 9 arrest did not violate Plaintiff's constitutional rights. Specifically, Defendants argue that there was no constitutional violation because the BRPD officers who arrested Plaintiff had probable cause to arrest him for the charged offense, La. R.S. §14:97, or for some other offense, such as La. R.S. § 14:100.1 (Obstructing Public Passages) and/or La. R.S. § 14:329.1 (Rioting).[156] Defendants argue that the "evidence also demonstrates that probable cause existed to arrest Plaintiff" because, "[a] review of the videos and undisputed facts show," that Plaintiff was dressed similarly to and protesting "next to" a group of "hostile, illegal protestors" who were "purposefully obstructing the roadway."[157] Defendants explain that based on this, the arresting officers "reasonably inferred that [P]laintiff either had committed or was about to commit a violation" of La. R.S. § 14:97 or the other potential offenses identified.[158]

---

[155] R. Doc. 109-1, pp. 5-14 (argument related to policy and custom) and pp. 16-20 (argument related to false arrest)

[156] *Id*. at p. 17.

[157] *Id*. at p. 17-19.

[158] *Id*. at p. 18.

Plaintiff disputes that the officers who arrested him had probable cause.[159] Plaintiff submits that the evidence currently before the Court shows that the BRPD officers had no probable cause to arrest him for violating La. R.S. § 14:97 or any other offense. Specifically, Plaintiff testified in his deposition that he "never" stepped foot in the roadway. He claims that the videos in evidence "corroborate" his testimony. Further, Plaintiff notes that Corporal Osborne, who was listed as Plaintiff's arresting officer on the arrest report, was not present for Plaintiff's arrest and did not observe Plaintiff enter the roadway or commit any other offense for which Defendants claim he could be arrested.[160] Indeed, Plaintiff notes that several other arresting officers testified that they do not recall any of the events leading up to Plaintiff's arrest. Finally, other BRPD officers testified that Plaintiff would not have violated La. R.S. § 14:97 by simply standing on the curb.[161] For these reasons, Plaintiff argues that there are genuine issues of material fact regarding (1) whether Plaintiff was ever in the roadway, (2) whether probable cause existed to arrest Plaintiff for La. R.S. § 14:97, or (3) whether any of the arresting officers reasonably believed that they had probable cause to arrest Plaintiff.

Plaintiff is correct. There are disputed issues of material fact regarding whether probable cause existed to arrest Plaintiff on July 9. First, the Affidavit of Probable Cause related to Plaintiff's arrest states, in part:

> On the above listed date numerous BRPD officers were assigned to provide security for a planned peaceful protest at 9000 Airline Highway [BRPD Headquarters]. The protestors were assembled in the parking lot of the Circle K at 9110 Airline. Via loud speaker *protesters were advised to remain on private property and on the curb. They were also notified to stay out of the roadway and to not impede the flow of traffic. These announcements were made frequently via loud speaker and via individual*

---

[159] R. Doc. 134, p. 32.

[160] *Id*. at p. 32.

[161] R. Doc. 134-7 (Dabadie Dep.), at 152:9-13 ("I mean, I can assume that if he's standing on the curb, then technically under the letter of the law as its written in 14:97, that he didn't violate that statute if he's on the curb.").

*police on the scene. During the protest, the defendant [here, Plaintiff] entered the roadway and was provided another verbal order to exit the lanes of travel. Moments later, the defendant [here, Plaintiff] entered the roadway again and was taken into custody by officers on scene without incident. The defendant was placed under arrest…*[162]

In contrast, Plaintiff testified in his deposition that he "never" stepped into the roadway on July 9,[163] although he was at times preceding his arrest, in the grassy embankment along, and on the "curb" to, Airline Highway.[164] Corporal Osborne, the "arresting officer" in the Affidavit of Probable Cause, testified in his deposition that he did not observe Plaintiff commit any crimes, and that his knowledge of the crimes purportedly committed by Plaintiff were "communicated to him" by another officer.[165] Likewise, the BRPD officers who actually arrested Plaintiff all testified that do not remember anything about Plaintiff's arrest.[166] Importantly, there is a dispute amongst BRPD officers over whether standing on the curb alone violates La. R.S. § 14:97.[167]

---

[162] R. Doc. 134, p. 12; R. Doc. 134-19, p. 2 (emphasis added). There is also a factual dispute over whether BRPD or any other law enforcement agency made an announcement via loudspeaker for protesters, including Plaintiff, to stay out of the roadway. *Compare* R. Doc. 134-14 (Day Dep.), 41:12-19 (testifying that he did not hear the police telling the New Black Panther Party members to get out of the roadway via the PA system), 42:3-20 (testifying the police officers were "telling us over there in the grass, don't get in the street and stuff," but that he heard no announcements to stay out of the street) with R. Doc. 134-10 (Murphy Dep.), 77:2 – 78:9 (testifying that orders to stay out of the roadway were made via a PA system); R. Doc. 134-8 (Leach Dep.), 153:1- ("…the command was given to disburse, but people continued to stay in the roadway…").

[163] R. Doc. 134-14 (Day Dep.), at 27:22-24 ("Q. Okay. And did you ever step foot in the roadway? A. Never.").

[164] *Id*. at 54:18-22 ("Q.…Are you in the roadway, or are you in the grass? A. Standing on the curb."). *See also id*. at 59:1-13; 60:11-61:1.

[165] R. Doc. 134-12 (Osborne Dep.), at 85:7-88:20.

[166] *See, e.g.,* R. Doc. 134-10 (Murphy Dep.), at 80:16-21 ("Q. Okay. Now I'm going to ask you to tell me what you remember about the arrest of [Plaintiff]? A. Okay. Specifically him, I don't…If I did, I'd tell you."); R. Doc. 134-11 (Neyland Dep.), at 57:21 – 59:20 ("Q.…What is the reasonable suspicion in the situation of the video [showing Plaintiff's arrest]? That he was wearing a black shirt? A. He was in the roadway. Q. Okay. He was in the roadway. And you saw him in the roadway? A. I see a lot of people. And I don't remember and exactly recall everything that happened that day…. To be honest with you, I don't remember the incident that happened, really and truly. Q. But you saw it on [the video]? A. I saw it on here, but I don't remember exactly that happening, to be honest with you."); R. Doc. 134-13 (Thomas Dep.), at 60:11-61:9 (Q.…What do you remember about [Plaintiff's] arrest? A. I have no idea. I don't even remember seeing him. Looking at the video, I have no recollection of anything of him…. Q. So you don't recall having received an order to arrest [Plaintiff]? A. I don't remember. It was 3 years ago. I don't even remember seeing him. Is my name on the affidavit? I have no idea.") and 76:9-11 ("Q. Did you yourself see [Plaintiff] enter the roadway at any point? A. It's 3 years ago. I have no idea.").

[167] *Compare* R. Doc. 134-7 (Dabadie Dep.), at 151:20 – 152:13 (testifying that if Plaintiff was only "standing on the curb, then technically under the letter of the law as it's written in 14:97, that he didn't violate that statute if he's on

31

Further, while capturing portions of Plaintiff's experience while protesting on July 9 and his arrest, the videos relied on by both parties do not conclusively show Plaintiff entering or standing in the roadway.[168] Nor do they show Plaintiff entering the roadway twice, as the Affidavit of Probable Cause suggests.[169] The most the videos clearly show is Plaintiff standing in the grass embankment and on the curb in the minutes time leading up to his arrest.

Viewing all facts in favor of Plaintiff, Defendants have failed to carry their burden of showing that there are no genuine issues of material fact regarding Plaintiff's claim for *Monell* liability relating to his purportedly false arrest. This claim involves multiple material, factual disputes that cannot be resolved on summary judgment. Additionally, resolution of whether probable cause existed to arrest Plaintiff—even when considered through the eyes of a reasonable officer—involves making credibility determinations and weighing evidence, both of which are inappropriate at this stage. Defendants' summary judgment on this claim will be denied.

---

the curb"); R. Doc. 134-8 (Leach Dep.), at 161:24 – 162: 6 (testifying that "if someone stayed off of the roadway or on the curb it is not obstruction of the highway," and if "you just step off the curb on the roadway and step back on the curb, I don't think that is obstruction of the highway"); *with* R. Doc. 134-9 (Martin Dep.), at 93:1-13 ("Q. Is a curb part of a roadway. A. In my view, yes. It's an improved surface, part of the roadway…Q. Okay. So standing on the curb would be rendering movement more difficult? A. It could possible, yes. You're not at a crosswalk.") and 95:11-19 (testifying that if law enforcement officers blocked off a roadway, someone standing on the curb would not violate La. R.S. § 14:97); R. Doc. 134-6 (Barron Dep.), at 64:8-23 ("Q. And in your understanding of the statute that we've been talking about, 14:97, if [Plaintiff] had been just a step off the curb at that point, would he be in violation of that statute? A. I would believe in the roadway is violating the statute…And it's basically a safety thing. I mean, if a car could ride by with a mirror and whack him, you know, it's not safe for him to stand on the side of the road—in the roadway, that is. Whether it's on the while line or with his toes over the line or whatever, it's not safe."); R. Doc. 134-10 (Murphy Dep.), at 96:17-24 ("Q. Would it be correct to say that you were instructed to arrest a person who was stepping off the curb, but not moving beyond that, for simple obstruction of a highway of commerce? A. If they stepped in the road, then that was an obstruction. I mean, even if they stepped in the road, stepped back out of the road, they still committed that offense.").

[168] *See, e.g.*, the DeSalvo, Dyer videos, Wilson videos, and Stewart videos, all manually filed at Exhibits 1-5, 8-14. *See also* the video taken by Plaintiff and manually filed as Exhibit 6.

[169] *Id.*

32

### b.    Excessive Force

Plaintiff claims that BRPD officers used excessive force when they arrested him in violation of his constitutional rights. Claims for false arrest and excessive force are "separate and distinct" under federal law.[170] "If the force used during an unlawful arrest did not exceed the quantum of force allowable had the arrest been lawful, a plaintiff cannot maintain an excessive force claim alongside her false arrest claim."[171]

To show that the force used to arrest him was excessive, Plaintiff must establish the following elements: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[172] The Fifth Circuit has recognized that the last two elements are "intertwined and often considered together."[173] "To determine whether the force was objectively unreasonable, this court must carefully evaluate the individual facts in each case and consider the totality of the circumstances."[174] Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest."[175] The temporal focus is on how the officer perceived the scene as it unfolded, not with perfect hindsight.[176] However, the Fifth Circuit explained that "an officer cannot, in the

---

[170] *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007). *See also Perry v. City of Bossier*, No. 17-0583, 2018 WL 5074674, at *11 (W.D. La. Oct. 17, 2018) (citing *Freeman*, 483 F.3d at 417).

[171] *Perry*, 2018 WL 5074674, at *11 (citing *Freeman*, 483 F.3d at 417).

[172] *Defrates v. Podany*, 789 Fed. Appx. 427, 433–34 (5th Cir. 2019) (quoting *Deville*, 567 F.3d at 167 (quotation omitted)). *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Freeman*, 483 F.3d at 416).

[173] *Id*. (referencing *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5thCir. 2018)).

[174] *Id*. (quoting *Deville*, 567 F.3d at 167).

[175] *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989).

[176] *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013).

face of minimal to no resistance, immediately resort to overwhelming force when stopping a suspect for a minor traffic violation."[177]

Here, Plaintiff testified in his deposition that the officers forced him to the ground, drug him across a grassy area, and punched, kicked, and beat him while arresting him for violation La. R.S. § 14:97.[178] He also claims that he did not resist arrest.[179] Plaintiff testified that he suffered scrapes and bruises, cuts and a gash on his face, eye injuries that require him to wear glasses, and psychological injuries for which he sees a counselor about once a month.[180] Defendants argue that the officers force was reasonable under the circumstances and, even if the force applied caused injuries, those injuries were *de minimis*.[181] Like with Plaintiff's false arrest claim, both sides claim the videos prove that their version of events is correct.[182]

First, there are factual disputes regarding whether the BRPD officers used excessive force in arresting Plaintiff, as well as whether such forced caused Plaintiff injuries greater than *de minimis*. To resolve these issues, the Court would be forced to make credibility determinations and weigh evidence. Neither is appropriate at the summary judgment stage.

Defendants' argument that Plaintiff's injuries are categorically *de minimis* is unavailing. In *Sam v. Richard*, the Fifth Circuit explained:

---

[177] *Defrates*, 789 Fed. Appx. at 433–34, citing *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (discussing *Deville, supra*, among other cases, as clearly establishing that an officer cannot "abruptly resort[ ] to overwhelming physical force rather than continuing verbal negotiations with an individual ... who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation").

[178] *See, e.g.*, R. Doc. 134-14 (Day Dep.), at 64:20 – 72:24.

[179] R. Doc. 134, pp. 38-39 (referencing the DeSalvo video).

[180] *See, e.g., id*. at 75:19 – 80:23, 85:8 – 91:25, 92:22 – 94:15 (Plaintiff describing his injuries).

[181] R. Doc. 109-1, pp. 20-24.

[182] *Compare* R. Doc. 134, p. 40 (Plaintiff arguing, "What is visible in the videos corroborates [his] testimony that he was grabbed from the neck from behind, forced to his knees, dragged across the ground by his legs, and held against the ground by multiple officers one of whom held [Plaintiff] against the ground by his neck") *with* R. Doc. 109-1, p. 22 ("the video clearly shoes no force other than minor restraint was used on the plaintiff…").

> Although a de minimis injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is directly related to the amount of force that is constitutionally permissible under the circumstances. Any force found to be objectively unreasonable necessarily exceeds the de minimis threshold, and, conversely, objectively reasonable force will result in de minimis injuries only.... In short, as long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force.[183]

Neither party attached the photographs discussed during Plaintiff's deposition that purportedly depict his injuries.[184] Nonetheless, the injuries about which Plaintiff testified are not categorically *de minimis* as a matter of law.[185]

Second, the videos relied on by both parties do not "utterly discredit" Plaintiff's testimony about the officers' use of force such that no reasonable jury could believe Plaintiff.[186] R. Docs. 109-20 – 109-22 are representative of the photographs and videos submitted by the parties.[187] They are screenshots of one of the videos, which show several BRPD on and/or around Plaintiff at the time of his arrest. While it is not clear that these photographs and videos support Plaintiff's version of events, they also do not "utterly discredit" or "blatantly contradict" Plaintiff's version.

As there are material factual disputes, summary judgment will be denied as to Plaintiff's claim for *Monell* liability related to excessive force.

---

[183] 887 F.3d 710, 713 (5th Cir. 2018) (quoting *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (emphasis removed)). *See also Scott v. White*, 810 Fed. Appx. 297, 300-301 (5th Cir. Apr. 24, 2020).

[184] *See* R. Doc. 134-14 (Day Dep.), at 76:11 – 77:5, 85:8 – 91:25 (discussing pictures of Plaintiff's injuries).

[185] While scrapes and bruises are likely *de minimis*, eye injuries that require glasses and psychological injuries for which Plaintiff still receives treatment may be sufficient to establish an excessive force claim.

[186] *See* ns. 54-55, *supra*.

[187] *See Darden*, 880 F.3d at 729-30; *Hegeman*, 2019 WL 1275523, at *8-9 (both discussing and distinguishing *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S.Ct. 1769 (2007) (holding that the plaintiff's "version of events [wa]s so utterly discredited by [a videotape] in the record that no reasonable jury could have believed him").

### c.    Retaliatory Arrest in Violation of First Amendment Rights

"[T]he First Amendment prohibits government officials from taking retaliatory actions against individuals for engaging in protected speech."[188] "If an official takes adverse action against someone [for engaging in protected speech], and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim."[189] To prevail on his First Amendment retaliation claim, Plaintiff must show: (1) he was engaged in a constitutionally protected activity; (2) the actions of Defendants caused him to suffer an injury "that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that Defendants' actions were substantially motivated against his exercise of constitutionally-protected activity.[190]

Plaintiff must also establish a "causal connection" between Defendants' "retaliatory animus" and his "subsequent injury."[191] "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury."[192] It must be a 'but-for' cause, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."[193]

---

[188] *Nieves v. Bartlett*, ---U.S.---, 139 S.Ct. 1715, 1722, (2019) (citations omitted). *See also Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999) ("[T]he First Amendment prohibits not only direct limitations on speech but also adverse government action against an individual because of [his] exercise of First Amendment freedoms.").

[189] *Id*. at 204 (citations omitted).

[190] *Rodgriguez v. Rutter*, 310 Fed. Appx. 623, 627 (5th Cir. 2009); *Izen v. Catalina*, 398 F.3d 363, 367 (5th Cir. 2005) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).

[191] *Nieves*, 139 S.Ct. at 1725 (citation omitted). *See also Kokesh v. Curlee*, 422 F.Supp.3d 1124, at 1131-32 (E.D. La. Oct. 24, 2019).

[192] *Id*. (emphasis in original). *See also Kokesh*, 422 F.Supp.3d at 1131-32.

[193] *Id*. (citation omitted).

"The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim."[194] "Courts do not reach the causation analysis described above unless the plaintiff establishes an absence of probable cause."[195] However, in *Nieves*, the Supreme Court explained that the "no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."[196]

Here, summary judgment on this claim is not appropriate for the reasons explained in Section II(D)(3)(a) above. First, there are genuine issues of material fact regarding whether the BRPD officers had probable cause to arrest Plaintiff for violating of La. R.S. § 14:97 or any other statute. There are competing views of why Plaintiff was arrested, and the videos do not conclusively establish what occurred. The videos before the Court do show that Plaintiff was engaged in protected speech with BRPD officers in the minutes leading up to his arrest. A reasonable jury could find that Plaintiff's protected speech was the reason he was arrested.

Moreover, this case may fit the exception to the no-probable-cause requirement announced in *Nieves*.[197] Photographs and videos relied on by both parties show numerous protesters who were in the same general location as Plaintiff, as well as some who are conclusively shown to be in the roadway, that were not arrested.[198] A reasonable jury could conclude that the only difference

---

[194] *Id*. at 1725.

[195] *Kokesh*, 422 F.Supp.3d at 1132 (citing *Nieves*, 139 S.Ct. at 1725).

[196] *Id*. *See also Simmons v. Fair*, No. 20-60297, 2020 WL 6053365, at n.2 (5th Cir. Oct. 13, 2020) (noting that *Nieves* established as exception to the general rule that probable cause should…defeat a retaliatory arrest claim."); *Ayala v. Aransas County*, 777 Fed. Appx. 100, 107 n. 5 (5thCir. July 2, 2019) ("The Supreme Court recently announced an exception to the general notion that probable cause ordinarily defeats a retaliatory arrest claim: 'when a plaintiff present objective evidence that he was arrested when otherwise similar situated individuals not engaged in the same sort of protected speech had not been.'" (quoting *Nieves*)).

[197] *See* R. Doc. 134, n.212 (discussing *Nieves*).

[198] *See, e.g.*, R. Docs. 109-20 – R. Doc. 109-22; Plaintiff's video, manually filed as Exhibit 6; Ryan Kailath's video, manually filed as Exhibit 8-2. *See also* the officer's videos, manually filed as Exhibits 1-5, 8-15.

between Plaintiff and the protestors who were not arrested is that Plaintiff was directing his protected speech at the officers, rather than just present at the protest.

As there are genuine issues of material fact in dispute regarding Plaintiff's *Monell* claim based on the underlying constitutional violation of First Amendment retaliation, summary judgment on this claim will be denied.

### d. Application to Plaintiff's As-Applied Challenge to La. R.S. § 14:97

Plaintiff challenged the constitutionality of La. R.S. 14:97 as applied to him via July 9 arrest.[199] "Although litigants are permitted to raise both as-applied and [facial] challenges, the lawfulness of the particular application of the law should ordinarily be decided first."[200] Plaintiff has only asserted an as-applied challenge. "As-applied challenges require a court to determine whether a statute is administered unconstitutionally against a particular plaintiff."[201]

In their Motion, Defendants argues that Plaintiff's as-applied claim "fails as a matter of law" because Plaintiff was "participating in the illegal act of obstructing the highway with the [New Black Panther Party] group," such that probable cause to arrest Plaintiff for violating La. R.S. § 14:97 existed.[202]

---

[199] R. Doc. 30, ¶¶ 105-108. Plaintiff claims that Defendants' use of La. R.S. § 14:97 to arrest him "criminalizes Plaintiff's exercise of his rights to freedom of expression and assembly in public streets."[199] He further claims that, as applied to him, La. R.S. § 14:97 is unconstitutional because its "criminalizes demonstrations, or picketing in the roadway, sidewalks, neutral ground, and other traditionally public fora."[199] Lastly, Plaintiff claims that Defendants' use of La. R.S. § 14:97 to arrest him "was unconstitutional and violated Plaintiff's First and Fourteenth Amendment rights."[199]

[200] *Roy v. City of Monroe*, 950 F.3d 245, 251 (5th Cir. 2020) (internal quotations and citations omitted). "The facial/as-applied distinction merely goes to the breadth of the remedy employed because a facial challenge is an argument for the facial invalidation of a law, whereas an as-applied challenge is an argument for the narrower remedy of as-applied invalidation." *Sonnier v. Crain*, 613 F.3d 436, 459 (5th Cir. 2010), *withdrawn in part*, 634 F.3d 778 (5th Cir. 2011).

[201] *Does #1-7 v. Abbott*, 345 F.Supp.3d 763, 773-74 (N.D. Tex. Nov. 19, 2018).

[202] R. Doc. 109-1, p. 26.

Plaintiff argues that "[t]he application by BRPD of La. R.S. 14:97 to criminalize any participation in the police protest is an unconstitutional use of 14:97, and constitutes retaliation against [Plaintiff] for exercise of his First Amendment rights."[203] Plaintiff's as-applied challenge appears wholly derivative of his claims that he was falsely arrested and retaliated against for exercising his First Amendment rights.

Having determined that factual dispute(s) about the existence of probable cause preclude summary judgment as to Plaintiff's false arrest and First Amendment retaliation claims, for those same reasons, summary judgment will be denied as to Plaintiff's as-applied claim.

## III.    Application to Plaintiff's State Law Claims

### A.    Violation of Free Expression Protection of Louisiana State Constitution

Plaintiff claims that his July 9 arrest violated his rights under Article I, Section 7 of the Louisiana Constitution.[204] Article I, Section 7 of the Louisiana Constitution states, "No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom." In *Winn v. New Orleans City*, the Eastern District of Louisiana explained:

> Louisiana's constitutional protection of free speech mirrors that of the First Amendment. The Louisiana Supreme Court has stated that Louisiana's protection of free speech was designed to serve the same purpose as the federal constitution. Accordingly, courts have held that the judicial determination of a claim brought pursuant to the parallel sections of the federal constitution is applicable to Article 1, sections 7 and 8 of the state constitution.[205]

---

[203] R. Doc. 134, pp. 41-43.

[204] R. Doc. 30, ¶¶ 124-127.

[205] No. 12-1307, 2015 WL 10713690, at *5 (E.D. La. Jan. 14, 2015) (international quotations and citations omitted). *See also Heaney v. Roberts*, 864 F.3d 795, 802 n.2 (5th Cir. 2017).

In the Motion, Defendants argue that Plaintiff's violation of free expression claim is "wholly undeveloped and unsupported."[206] The premise underlying Defendants' argument is that Plaintiff's arrest and purported deprivation of rights occurred because BRPD officers had "reasonable probable cause that he was committing statutory violations."[207] Plaintiff counters that none of the BRPD officers who arrested Plaintiff "were able to testify that they observed him violate a law,"[208] such that a reasonable jury could conclude that he was arrested because Defendants wanted to prevent him from protesting.[209]

Summary judgment will be denied on this claim for the same reasons summary judgment is inappropriate on Plaintiff's false arrest and First Amendment retaliation claim, as well as his as-applied constitutionality claim.

## B.    Violation of Right to Privacy, Right to be Left Alone, and Rights of the Accused

Plaintiff claims that because he was arrested "without probable cause" and not "promptly" informed of his rights, Defendants violated his rights under Article I, Sections 5 and 13 of the Louisiana Constitution.[210]

"Under Louisiana law, the right of privacy encompasses four different interests: (1) the appropriation of an individual's name or likeness for the use or benefit of the defendant; (2) an

---

[206] R. Doc. 109-1, p. 29.

[207] *Id.*

[208] R. Doc. 134, pp. 47-48.

[209] *Id.*

[210] R. Doc. 30, ¶¶ 128-131. Article I, Section 5 of the Louisiana Constitution states, in part, "Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy…Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court." Likewise, Section 13 states, in part, "When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel."

unreasonable intrusion upon the plaintiff's physical solitude or seclusion; (3) publicity which unreasonably places the plaintiff in a false light before the public; and (4) unreasonable public disclosure of private facts."[211] The right to privacy in Louisiana has been described as "the right to be let alone" and "the right to an inviolate personality."[212] Invasion of privacy is an intentional tort, which "occurs when the defendant's conduct is "unreasonable and seriously interferes with the plaintiff's privacy interest."[213]

In the Motion, Defendants argue that the existence of probable cause to arrest Plaintiff for violating La. R.S. § 14:97 "negates the State law claim for violation of the right of privacy (false arrest) as alleged in Count Ten of the [P]laintiff's complaint."[214]

Plaintiff does not address Defendants' argument regarding the violation of his right of privacy and rights of the accused claims in his Opposition.[215] Indeed, Plaintiff's Opposition contains no mention of or references to Article I, Section 5 or Section 13 of the Louisiana Constitution, nor does it mention or contain any argument, supported by evidence, of how Plaintiff's right to privacy or rights of the accused were violated by Defendants.[216]

Plaintiff has abandoned his invasion of privacy and violation of the rights of the accused claims, as asserted in Count 10 of his Complaint, because he failed to oppose or address them in

---

[211] *Pinero v. Jackson Hewitt Tax Serv. Inc.*, 594 F. Supp. 2d 710, 721 (E.D. La. 2009) (citing *Spellman v. Discount Zone Gas Station,* No. 07-496, (La. App. 5 Cir. Dec. 27, 2007), 975 So.2d 44, 47; and *Jaubert v. Crowley Post–Signal, Inc.,* 375 So.2d 1386, 1388–89 (La.1979). Plaintiff has not specified which of the four interests he claims was violated by Defendants.

[212] *Id*. (quoting *Jaubert*, 375 So.2d at 1388 (internal citations omitted)).

[213] *Id*. (quoting *Jaubert*, 375 So.2d at 1389).

[214] R. Doc. 109-1, pp. 19-20.

[215] *See, generally*, R. Doc. 134-1.

[216] *Id*.

his Opposition to Defendants' Motion.[217] Summary judgment is granted as to these claims, and they will be dismissed with prejudice.

### C.    Tort Claims – Assault, Battery, False Imprisonment, Intentional Infliction of Emotion Distress, and Negligent Injury

Plaintiff asserts a negligence claim and a host of intentional tort claims under Louisiana law, including assault, battery, false imprisonment, and intentional infliction of emotional distress.[218]

Plaintiff's assault, battery, false imprisonment, and negligent injury[219] claims are essentially state law corollaries of his § 1983 claims for false arrest and excessive force. Under Louisiana law, a battery is "the intentional use of force or violence upon the person of another," while an assault is "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery."[220] Likewise, "[t]he Louisiana tort of false imprisonment consists of two elements: (1) detention of the person; and (2) the lawfulness of the detention."[221] The basis for these claims is Louisiana Civil Code article 2315.[222]

---

[217] *See, e.g.*, *Harris v. Labor Finders International, Inc.*, No. 17-692, 2019 WL 407396, at *7 and n. 69 (M.D. La. Jan. 31, 2019). "The law is clear that 'failure to address a claim in response to a defendant's summary judgment motion constitutes abandonment of the claim." *Id.* at n.69, quoting *Valenza v. Wal-Mart Stores, Inc.*, No. 16-2469, 2016 WL 7407178, at * 4 (E.D. La. Dec. 22, 2016) (quoting *Vela v. City of Houston*, 276 F.3d 659, 678-79 (5th Cir. 2001)).

[218] R. Doc. 30, ¶¶ 132-135.

[219] The parties both discuss Plaintiff's Negligent Injury claim (R. Doc. 30, ¶¶ 148-152) in conjunction with their respective discussions of Plaintiff's battery and false imprisonment claims. *See, e.g.*, R. Doc. 109-1, pp. 28-29; R. Doc. 134, pp. 45-50. Accordingly, the Court will give it the same treatment and will not discuss it separately from those claims.

[220] *Barnes v. McQueen*, No. 14-2326, 2016 WL 872110, at *12 and ns.167-168 (E.D. La. Mar. 7, 2016) (citations omitted). *See also* La. R.S. §§ 14:33, 14:36.

[221] *Huval v. Louisiana State Univ. Police Dept.*, No. 16-553, 2018 WL 1095559, at * (M.D. La. Feb. 28, 2018) (citing *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d 690 (La. 2006)).

[222] La. C.C. art. 2315 states, in part, "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

However, "[i]f an officer has probable cause for an arrest, they are not liable for false imprisonment."[223] Further, when "police lawfully arrest someone, [they] commit a battery if they use excessive force."[224] Because these claims turn on whether probable cause existed to arrest Plaintiff and/or whether Plaintiff was subjected to excessive force during his arrest, summary judgment will be denied as to these claims for the reasons explained above.

To prevail on his intentional infliction of emotional distress claim, Plaintiff must prove "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."[225] "Extreme and outrageous conduct includes conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'"[226] But, "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[227]

Here, there are disputes of material facts that preclude summary judgment. First, there is a factual dispute about whether Officers Neyland and Thomas, or any other BRPD officers, engaged in extreme and outrageous conduct by striking and beating Plaintiff. Plaintiff claims that he did not violate the law and did not resist the officers attempting to arrest him, but that he was

---

[223] *Huval*, 2018 WL 1095559, at *9 (citing *McMasters v. Dep't of* Police, 2013-0348 (La. App. 4 Cir. May 15, 2015); 172 So.3d 105, 116)). Indeed, "probable cause to arrest 'is an absolute defense to any claim against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *McMasters*, 172 So.3d at 116-17.

[224] *Huval*, 2018 WL 1095559, at *9 (citing *Kyle v. City of New Orleans*, 353 So.2d 969, 353 (La. 1977)).

[225] *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991). *See also Huval*, 2018 WL 1095559, at * 10; *Morice v. Hosp. Serv. Dist. #3*, 430 F. Supp. 3d 182, 213–14 (E.D. La. 2019).

[226] *Huval*, 2018 WL 1095559, at *10 (quoting *White*, 585 So.2d at 1209).

[227] *White*, 585 So.2d at 1209.

nonetheless forced onto the ground and hit, choked, and beaten, which, if true, would be extreme and outrageous conduct because "it would evince wanton and needless force."[228] Second, there is a factual dispute about whether Plaintiff suffered severe emotional distress. Plaintiff testified that he suffered some psychological issues that may have resulted from his July 9 arrest. A reasonable jury could conclude that Plaintiff suffered severe emotional distress. Finally, there is a factual dispute regarding whether the BRPD officers desired to inflict emotional distress and/or knew that it was substantially certain to result from their actions. Accordingly, Defendants' Motion will be denied as it relates to Plaintiff's claim for intentional inflection of emotional distress.

### D.    Abuse of Process

Plaintiff asserts a state law claim for abuse of process based on Defendants' use of "printed boilerplate affidavits to manufacture probable cause" and use of a "false, misleading, or otherwise deficient arrest report related to Plaintiff's arrest."[229]

"The essential elements of a cause of action for abuse of process are (1) the existence of an ulterior purpose; and (2) a willful act in the use of the process not in the regular prosecution of the proceeding."[230] "The precise inquiry involves the misuse of a process already issued whereby a party attempts to obtain some result not proper under the law."[231] Importantly, "[t]he tort of abuse of process involves the malicious use of a legal process *after* the process has been instituted."[232]

---

[228] *Huval*, 2018 WL 1095559, at *10.

[229] R. Doc. 30, ¶¶ 136-140.

[230] *Duboue v. City of New Orleans*, 909 F.2d 129, 132 (5th Cir. 1990) (citations omitted). *See also Swoboda v. Manders*, No. 14-19, 2016 WL 1611477, at *4 (M.D. La. Apr. 21, 2016).

[231] *Id*.

[232] *Id. See also McNeil v. Caruso*, No. 17-1688, 2019 WL 1435831, at *5 (M.D. La. Mar. 29, 2019) ("The tort [of abuse of process] must involve the malicious use of legal process after a process has been instituted (citation omitted)); *Swoboda*, 2016 WL 1611477, at *4; *Landrum v. Hutchinson*, No. 12-431, 2013 WL 230373, at *1 (M.D. La. Jan. 22, 2013) ("Abuse involves misuse of process already legally issued…"); *Laitram Machinery, Inc. v. Carnitech A/S*, 884 F.Supp. 1074, 1086 (E.D. La. 1995) ("Because [plaintiff's] abuse of process claim involves [defendant's] institution of the lawsuit and not anything done...*after* the lawsuit was instituted, [defendant] is entitled to summary judgment as a matter of law on the abuse of process claim under *Duboue*."); *Stark v. Eunice Superette, Inc.*, 457 So. 2d 291, 294

In the Motion, Defendants argue that summary judgment on this claim is appropriate because Plaintiff has produced "no evidence to suggest BRPD officers used templates for a malicious purpose."[233]

Plaintiff argues that the "ulterior motive" behind Defendants' use of "pre-printed affidavits of probable cause" is "presumed" because such affidavits were used for an "irregular purpose."[234] Plaintiff claims that based on the "improper" use of the pre-printed affidavits of probable cause, "a jury could find that defendants intended to take protesters to jail without having to bother to verify that there was a legal justification for each arrest made."[235]

Although the parties each recited the elements of an abuse of process claim, neither addressed whether there has been a "malicious use of a legal process *after* the process has been instituted." In *Duboue*, a plaintiff who claims he was wrongfully arrested sued a police officer and the City of New Orleans, asserting federal and state claims, including abuse of process.[236] A jury awarded the plaintiff $25,000 on his abuse of process claim. The defendants appealed, and the Fifth Circuit reversed the jury's award and dismissed Plaintiff's abuse of process claim against the police officer because, after the officer allegedly wrongfully arrested plaintiff, he did nothing to

---

(La. App. 3 Cir. 1984) (affirming trial court's ruling in favor of defendant finding no abuse of process where "[n]owhere is there any suggestion that defendant's owner or employees misused the criminal process once it was instituted.").

[233] R. Doc. 109-1, pp. 29-30.

[234] R. Doc. 134, pp. 48-49, quoting *Alden v. Lorning*, No. 2004-0724 (La. App. 4 Cir. 5/4/05); 904 So.2d 24, 28 (citing *Umerska v. Katz*, 477 So.2d 1252, 1256 (La. App. 4 Cir. 1985)).

[235] *Id*. at pp. 48-49.

[236] 909 F.2d 129. In *Duboue*, a son stole a father's car and pawned the rims to Duboue, the owner of an auto parts store. The father reported his car stolen to police and eventually his car minus two wheels and jack were returned. However, the police continued looking for the wheels. Officer Logan located the stolen wheels at Duboue's store and, per police procedure, intended to obtain a signed "Permission to Search and Seizure" from the store owner or a search warrant. Duboue refused to sign the form, so the Officer Logan obtained a search warrant from a magistrate. Officer Logan returned to Duboue's store with a signed search warrant, and they seized the stolen wheels and arrested Duboue. Duboue claimed the arrest was traumatic and caused problems in his life, and he sued the officer and the City of New Orleans.

further the process.[237] In dismissing the abuse of process claim, the Fifth Circuit explained, "Officer Logan instituted the process [by arresting Doboue], but did nothing further in carrying it to its conclusion. Therefore, Officer Logan cannot be said to have abused the process after its institution."[238]

Like Officer Logan in *Doboue*, the BRPD officers who arrested Plaintiff instituted the process when they arrested Plaintiff for violating La. R.S. § 14:97 and used a pre-printed/form affidavit of probable cause. However, as both parties admit, the District Attorney for East Baton Rouge Parish declined to prosecute Plaintiff and other protestors for alleged violations of La. R.S. § 14:97.[239] The charges against Plaintiff were dropped, and there was "no process" to be abused after it was instituted by Plaintiff's arrest. Because Plaintiff cannot show that any process, including the use of pre-printed affidavits of probable cause, was abused *after* he was arrested, summary judgment is appropriate. Plaintiff's claim for abuse of process will be dismissed with prejudice.

### e.    Abuse of Rights

Plaintiff asserts a state law claim for abuse of rights.[240] "The abuse of rights doctrine is a civilian concept which is applied only in limited circumstances ...."[241] "The doctrine applies only when one of the following conditions is met: (1) the predominant motive for exercise of the right is to cause harm; (2) there is no legitimate motive for exercise of the right; (3) exercise of the right

---

[237] *Id.* at p. 132.

[238] *Id.* at p. 132.

[239] R. Doc. 30, ¶ 9; R. Doc. 109-1, p. 4; R. Doc. 134, p. 28.

[240] R. Doc. 30, ¶¶ 141-147

[241] *LNV Corp. v. Pawan Hosp., LLC*, No. 19-0605, 2020 WL 4012118, at *7 (W.D. La. June 30, 2020), *report and recommendation adopted sub nom. LNV Corp. v. Pawan Hosp., LLC.*, No. 19-0605, 2020 WL 4011792 (W.D. La. July 15, 2020) (citations omitted).

violates moral rules, good faith, or elementary fairness; or (4) exercise of the right is for a purpose other than that for which it was granted."[242] "If a party has a legitimate and serious interest in exercising a [legal] right, he may do so even if it causes harm to another. However, if a party does not have a legitimate and serious interest in the exercise of the right, and to do so would bring unnecessary harm to another, the doctrine of abuse of rights will bar exercise of the right."[243] The abuse of rights doctrine has been "enforced sparingly" because "its application 'renders unenforceable one's otherwise judicially protected rights.'"[244] Although the abuse of rights doctrine "typically applies in cases implicating contractual or property rights," it has been discussed in other contexts, including alleged "unreasonable and arbitrary exercise [of a police officer's] discretion to arrest."[245]

In the Motion, Defendants argue that summary judgment is warranted because "Plaintiff cannot satisfy any of [the] elements [of an abuse of rights claim] and all of the evidence presented herein establishes the contrary."[246] Plaintiff argues in his Opposition that the "lack of probable cause for the arrest of [Plaintiff] under R.S. 14:97" and Chief Dabadie's order to "clear the roadway" combined with the evidence submitted relating to same, are sufficient for a reasonable jury to find that "defendants exercised their right to arrest for purposes other than for which it was granted."[247]

---

[242] *Id*. *See also Morice*, 430 F.Supp.3d at 213 (quoting *Mixon v. Iberia Surgical, L.L.C.*, 956 So. 2d 76, 81 (La. App. 2007) (internal quotation marks and citation omitted)).

[243] *Morice*, 430 F.Supp.3d at 213 (quoting *Mass. Mut. Life Ins. Co. v. Nails*, 549 So. 2d 826, 829 (La. 1989) (citation omitted)).

[244] *Id*. (quoting *Truschinger v. Pak*, 513 So. 2d 1151, 1154 (La. 1987)). *See also Ill. Cent. Gulf R.R. Co. v. Int'l Harvester Co., 368 So. 2d 1009, 1013-14 (La. 1979) (explaining origin of doctrine and rarity of application).*

[245] *See, e.g.*, *Schexnider v. Schexnider*, No. 11-2148, 2014 WL 3899132, at *7-8 (W.D. La. Aug. 8, 2014).

[246] R. Doc. 109-1, pp. 30-31.

[247] R. Doc. 134, p. 49.

As explained above, factual disputes exist regarding whether the BRPD officers had probable cause to arrest Plaintiff and, relatedly, whether Plaintiff was arrested in retaliation for exercising his First Amendment rights and criticizing police officers—*i.e.*, a purpose other than for which the right to arrest was granted. For the same reasons, Defendants' motion summary judgment as to Plaintiff's abuse of rights claim will be denied.

## IV.    CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that the Motion for Summary Judgment,[248] filed by the City and the Mayor, is **GRANTED IN PART AND DENIED IN PART**.

Specifically, **IT IS ORDERED** that the following claims of Plaintiff Travis Day are **DISMISSED WITH PREJUDICE**: (1) all claims against Mayor Sharon Weston Broome for failure to provide sufficient evidence that the Mayor had final policymaking authority over any of the policies that are alleged to be the moving force behind any violation of Plaintiff's constitutional rights, and (2) all claims of *Monell* liability premised on (a) custom or practice, as Plaintiff has not put forth sufficient evidence to show prior incidents in sufficient kind or number; (b) ratification liability, as Plaintiff has failed to show that this is the type of extreme situation to which that theory applies; and (c) failure to train or supervise, as Plaintiff has not provided evidence to show prior incidents in sufficient kind or number.

**IT IS FURTHER ORDERED** that, with respect to Plaintiff's claims under state law for violation of his rights to privacy under Article I, Section 5 of the Louisiana Constitution and his rights of the accused under Article I, Section 13 of the Louisiana Constitution, the Motion is **GRANTED**, as Plaintiff failed to address Defendants' Motion with respect to those claims in his Opposition and thus, abandoned those claims.

---

[248] R. Doc. 109.

**IT IS FURTHER ORDERED** that Defendant's Motion is **GRANTED** as to Plaintiff's abuse of process claim as Plaintiff has failed to establish that any process was taken after Plaintiff was arrested. Plaintiff's state law claims for violation of his rights under Article I, Section 5 and Section 13 of the Louisiana Constitution, and based on abuse of process, are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendant's Motion is **DENIED** in all other respects.

Signed in Baton Rouge, Louisiana, on November 30, 2020.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**